FILED
CLERK, U.S. DISTRICT COURT

JUN 1 5 2006

CENTRAL DISTRICT OF CALIFORNIA
BY

1    UNITED STATES OF AMERICA
     UNITED STATES DISTRICT COURT
2    CENTRAL DISTRICT OF CALIFORNIA
          WESTERN DIVISION

3
              - - -
4    HONORABLE CHRISTINA A. SNYDER
     UNITED STATES DISTRICT JUDGE PRESIDING
5              - - -

6
     UNITED STATES OF AMERICA,        )      **ORIGINAL**
7                                     )
                   PLAINTIFF,         )
8                                     )
     VS.                              )      CASE NO: CR
9                                     )      02-00003(B)-CAS
     KHALIL MOHAMMED, ET AL.,         )
10                                    )
                   DEFENDANT.         )
11                                    )
     _____)
12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             MONDAY, JULY 29, 2002

17            LOS ANGELES, CALIFORNIA

18

19

20

21

22        LAURA MILLER ELIAS, CSR 10019
          FEDERAL OFFICIAL COURT REPORTER
23        312 NORTH SPRING STREET, ROOM 453
          LOS ANGELES, CALIFORNIA 90012
24            PH:  (213)620-0890

25

DOCKETED ON CM

JUN 1 9 2006

BY                029

2713

UNITED STATES DISTRICT COURT

```
 1

 2      APPEARANCES OF COUNSEL:

 3      ON BEHALF OF PLAINTIFF:

 4              DEBRA W. YANG
                UNITED STATES ATTORNEY
 5
                BY:  MICHAEL STERN
 6              GONZALO CURIEL
                CHRISTOPHER BRUNWIN
 7              ASSISTANT UNITED STATES ATTORNEY

 8              1100 UNITED STATES COURTHOUSE
                312 NORTH SPRING STREET
 9              LOS ANGELES, CA 90012


10

11      ON BEHALF OF DEFENDANTS:

12
                APPEARANCES AS NOTED IN THE RECORD
13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT



INDEX


PROCEEDINGS                              PAGE

STATUS CONFERENCE                          4

UNITED STATES DISTRICT COURT

```
 1      LOS ANGELES, CALIFORNIA, MONDAY, JULY 29, 2002; 1:30 P.M.

 2                          -  -  -

 3              THE CLERK:  Please come to order.  This court is

 4      now in session.  The Honorable Christina A. Snyder,

 5      presiding.

 6              Calling the matter of Criminal Case

 7      No. 02-00003(B)-CAS.  United States versus Khalil Mohammed.

 8              And I'll let counsel please state your appearances

 9      and state the defendant that they represent.  And then please

10      you're going to have to step up to the podium every time you

11      want to speak.  There's no microphones on the sides.

12              MR. STERN:  Good afternoon.  Michael Stern,

13      Gonzalo Curiel and Chris Brunwin appearing on behalf of the

14      United States.

15              THE COURT:  Good afternoon.

16              MR. KATZ:  Good afternoon, Your Honor.  David Katz

17      appearing for Khalil Mohammed who is present in custody.

18              THE COURT:  All right.  Good afternoon.

19              MR. ALLEN:  Good afternoon, Your Honor.  Bruce

20      Allen on behalf of Mahmoud Khattab who is present in custody

21      assisted by the Arabic interpreter.

22              MR. PEREZ:  Good afternoon, Your Honor.  Hector

23      Perez appearing on behalf of Musbah Tarbush.  He is present

24      in custody, Your Honor.

25              MR. ARRENDONDO:  Good afternoon, Your Honor.  David
```

1  Arrendondo appearing on behalf of Rasheed Aziz who is present

2  in custody.

3         MR. NEWMAN:  Good afternoon, Your Honor.  Brian

4  Newman appearing on behalf of Akram Omar who is also present

5  at the table.  Your Honor, I'm also making a special

6  appearance for attorney Marsha Brewer on behalf of Rigoberto

7  Covarrubias who is not present.  There is a waiver of

8  presence on file.

9         THE COURT:  All right.  Good afternoon.

10         MR. WERKSMAN:  Good afternoon, Your Honor.  Mark

11  Werksman appearing on behalf of Adnan Isa who is present in

12  custody.  And Your Honor, I'm requesting that he be assisted

13  by the interpreter.  Can we have a set of ear phones for him

14  if there will be an Arab interpreter?

15         THE COURT:  We should have a set, don't we?

16         THE INTERPRETER:  Your Honor, I believe the other

17  Arabic interpreter went to get two more headsets from

18  downstairs per instructions from our office.  And the other

19  Arabic interpreter is interpreting.

20         THE COURT:  Thank you.

21         MR. POTTER:  Good morning, Your Honor.  Paul

22  Potter.  I was appointed this morning to represent Abdallah

23  Ayyeh who is sitting to my right and I'm here with him.

24         THE COURT:  Thank you.

25         MR. RICHARDS:  Good afternoon, Your Honor.  Ronald

1    Richards appearing with Mufid Isa who is in custody.

2              THE COURT:  All right.  Good afternoon.

3         MR. BACHMAN:  Good afternoon, Your Honor.  Larry

4    Bachman on behalf of Carlos Garcia Aguayo who is present in

5    court in custody being assisted by the Spanish interpreter.

6         MR. REED:  Good afternoon, Your Honor.  David Reed

7    on behalf of Fernando Valle.  He is present in court being

8    assisted by the Spanish interpreter.  And Your Honor, I'd

9    like to ask your permission for something.  At 2:30 I have to

10   leave for a mandatory training session for the Riverside Bar

11   Panel which starts at about quarter to 4:00.  Would the Court

12   give me permission to stay for the motions, but allow me to

13   leave the courtroom at approximately 2:30?  Mr. Bachman and

14   my client have consented to have Mr. Bachman stand in for me

15   specially thereafter.

16             THE COURT:  All right.  Let's hear from your

17   client whether that's agreeable.

18             DEFENDANT VALLE:  Yes.

19             THE COURT:  All right.  Thank you.  You may then.

20        MR. REED:  Thank you, Your Honor.

21        MR. CALLAHAN:  Your Honor, good afternoon.  Richard

22   Callahan also here on behalf of Mufid Isa and I'm specially

23   appearing Your Honor for Dale Rubin on behalf of Rudy Hooper

24   who is present.  He is on bond.  I have discussed the matter

25   with him and he has no objection to my standing in today.

1          THE COURT:  All right.  Good afternoon.

2          MR. LICHTMAN:  Good afternoon, Your Honor.  Jay

3     Lichtman for Christian Boyd who is present.

4          MR. IZNER:  Good afternoon, Your Honor.  Allen

5     Izner on behalf of Said Abdelaziz.  He also needs the

6     assistance of an Arabic interpreter.

7          THE COURT:  Does he have head phones now?

8          MR. IZNER:  No.

9          THE COURT:  He does not?

10          MR. IZNER:  No, he doesn't have them at the moment.

11          THE COURT:  Is there anyone else who doesn't have

12     head phones?  We're up to two.

13          MR. CANTALUPO:  Yes, Your Honor.  Dominic Cantalupo

14     for Amjad Ayeh who is present in custody and does need head

15     phones for Arab interpretation.

16          THE COURT:  All right.

17          MR. NEWMAN:  Your Honor, Mr. Omar also requests

18     head phones.

19          THE COURT:  All right.  So we're now down several

20     sets.

21          MR. DENIS:  Your Honor, also for Nabhan Isa the

22     head phones.  David Denis on behalf of Nabhan Isa who is

23     present here in court through Alex Kessel's office.

24          THE COURT:  All right.  Good afternoon.

25          MR. SACKS:  Good afternoon, Your Honor.  Stephen

 1    Sacks for Alfonso Pelayo who is present on bond with the

 2    assistance of the Spanish interpreter.

 3         THE COURT:  All right.  Good afternoon.

 4         MR. KENT:  Good afternoon, Your Honor.  Jeff Kent

 5    and my partner Mike McDonnell on behalf of Khaled Shoukhah.

 6    He's in the box on the far right hand.

 7         MR. ROSEN:  Good afternoon, Your Honor.  Roger

 8    Rosen on behalf of Rudy Berreras.  He is before the court in

 9    custody over in the jury box.  And also Your Honor, I'm

10    appearing specially for Mr. Daryl Exum who represents

11    Mohammad Alasoud who is seated in the second row with his

12    hand up.  He is out of custody before the court.

13         THE COURT:  All right.  Good afternoon.

14         MR. MARKS:  Good afternoon, Your Honor.  Donald

15    Marks representing Stephen Almasri who is in custody.

16         MR. TREMAN:  Good afternoon, Your Honor.  Michael

17    J. Treman representing Tawfiq Musitef who is present here in

18    custody.  I'm also specially appearing for Mr. Boren who is

19    in another district court for Ahmad Jaris.  Mr. Jaris is

20    present here in court.  He does have head phones.  I have

21    spoken with him.  I believe he has no objection to my

22    standing in for Mr. Boren.

23         THE COURT:  All right.  Is that so?  Are you

24    willing to have Mr. Treman stand in for you?

25         DEFENDANT JARIS:  Yes.

UNITED STATES DISTRICT COURT

```
 1                    THE COURT:  Thank you.

 2                    MR. AMDUR:  Good afternoon, Your Honor.  Terry

 3      Amdur on behalf of Mohammed Eses who is present.  I am going

 4      to special appear for Patrick Boyd.  I special appeared for

 5      him this morning on behalf of Ellen Barry.  She is across the

 6      hall in Judge Tevrizian's courtroom so with the Court's

 7      permission I'll stand in for her.

 8                    THE COURT:  That's agreeable with me if it's

 9      agreeable with Mr. Boyd.

10                    DEFENDANT BOYD:  Yes, Your Honor.

11                    THE COURT:  Thank you.

12                    MR. STEINGARD:  Good afternoon, Richard Steingard

13      for Ferras Sallal.  He is present.  Your Honor, I have a

14      3 o'clock appearance before Judge Baird.  I'm not a party --

15      my client isn't a party to the stay or any of the motions.

16      So I assume --

17                    THE COURT:  You may be excused if you're not a

18      party and if your client is agreeable.

19                    MR. SACKS:  Your Honor, if I could just interject,

20      my client is also not a party to any of the motions.

21                    THE COURT:  And you are?

22                    MR. SACKS:  Stephen Sacks.  I'd ask that I be

23      allowed to be excused as well.

24                    THE COURT:  If your client has no objection, you

25      may be excused, Mr. Sacks.
```

UNITED STATES DISTRICT COURT

1        MR. ALLEN:  Your Honor, Bruce Allen on behalf of

2   Mahmoud Khattab.  I note that in reviewing the orders that my

3   client, along with several other of the defendants, have

4   their motion dates continued both with regard to filing.  If

5   it's all right with the Court, I would also request to be

6   excused with my client's nonobjection.

7        THE COURT:  I think that's fine.  The only thing I

8   do want to take up is scheduling before we excuse you so that

9   we're clear on what we're doing here.

10       Anyone else?  Okay.

11       Let me then be sure first of all that we have

12   adequate headphones.  I saw someone enter with some.  Who

13   else needs a headphone?

14       THE INTERPRETER:  Your Honor, I'm the Arabic

15   interpreter.  Good afternoon.  I went down to get more

16   headsets, but apparently four of them don't work.

17       THE COURT:  Well, I don't know exactly what to do

18   unless we can go to a neighboring courtroom, but I certainly

19   can't proceed if there are defendants who cannot hear these

20   proceedings.

21       THE INTERPRETER:  Your Honor, may I make a

22   suggestion?  I'm the Spanish interpreter and I'm doing live

23   interpretation for three of them.  If those four people who

24   need headsets could sit together one by the other so the

25   interpreter can do it in a live manner, maybe that will be a

1    solution for now.

2              THE COURT:  Okay.  Any objection?  I think that

3    makes very good sense.  Can we have the marshals seat the

4    three Spanish-speaking defendants together so that we can

5    interpret to them without headsets and give the extra

6    headsets over to the others?

7              MR. BACKMAN:  No objection on behalf Mr. Aguayo.

8              DEPUTY O'CONNOR:  Your Honor, Deputy O'Connor.

9    The Spanish speakers are sitting together right down here

10   with a live interpreter.  What I can do is I can take the

11   defendants, the Arabic speakers who don't have headsets, and

12   move them all into one area down here where they can be

13   spoken to.

14             THE COURT:  That's also agreeable, but I want to

15   be sure everyone in the courtroom understands these

16   proceedings.

17             THE CLERK:  Well, there's a defendant and

18   apparently somebody has been appointed.

19             THE COURT:  Well, is that defendant in the

20   courtroom?

21             THE CLERK:  Yes.

22             THE COURT:  Well, I don't think -- again, I'm not

23   going to proceed without an attorney for him.

24             MR. STERN:  The only suggestion that I could make

25   is that there's no motion pending with respect to this

1    defendant so the issues will be scheduling.    Perhaps one of

2    the other panel attorneys could stand in just for that

3    purpose.

4            THE COURT:   Well, I'm not sure that I see any

5    volunteers.   Let's ask Mr. Adnan.   I think that we -- it has

6    come to our attention that you have yet to have an attorney

7    appointed for you in this matter.   You are not a party to any

8    of the motions that are here today.   I want you to stay here

9    in these proceedings.   The only question now is what we're

10   going to do about scheduling.   I think what I'm going to do

11   is go ahead and schedule.   The only problem is if your

12   counsel needs to do something different later on, we'll have

13   to hear that.   Do you have any other suggestions, Mr. Stern?

14           MR. STERN:   No, Your Honor.   I think that's

15   appropriate.   And whomever the attorney is that ultimately

16   gets appointed, I'll speak with and transmit the schedule.

17   And if there's some problem, we can jointly bring it to the

18   Court's attention to resolve it.

19           THE COURT:   All right.   Let's start at the

20   beginning.   You have witnesses here, don't you, Mr. Stern?

21           MR. STERN:   Yes, I do.

22           THE COURT:   Who are they and on what motions?

23           MR. STERN:   There's a motion pending by Christian

24   Boyd to suppress evidence seized during the course of the

25   search warrant.   And the witnesses that I have are Ted

1    Salamay from the Drug Enforcement Administration.  His last

2    name is spelled S-a-l-a-m-a-y and I also Deputy Robert

3    Pleasant from the San Bernardino Sheriff's Department.

4              THE COURT:  Okay.  Now --

5              MR. STERN:  And I believe that that would be the

6    only testimony today that I would need to get in.

7              THE COURT:  All right.  Well, it seems to me that

8    we ought to take up the matter involving witnesses who are

9    present first, and then secondly, I guess I want to hear from

10   you and Mr. Katz regarding the motion regarding a possible

11   conflict.  It seems to me that the resolution that Judge

12   Phillips reached is the appropriate resolution in this case,

13   but obviously I want to hear from people, although I don't

14   know that we need everyone in the courtroom present for that.

15             MR. STERN:  My only suggestion and I'm certainly

16   ready to proceed with the witness's testimony, but my only

17   suggestion is that the testimony will certainly take a lot of

18   time and is only relevant to one of the defendants.  So if

19   the Court wanted to expedite allowing the other attorneys to

20   get back to their duties, it may make sense to do the

21   scheduling that is relevant to all of them and my witnesses

22   understand that they will have to stay as late as need be and

23   they have scheduled their time to do that.

24             THE COURT:  All right.  Well, let's start at the

25   beginning.  Let's figure out how we're going to go about

UNITED STATES DISTRICT COURT

 1    this.  I have the motion that I just mentioned about the

 2    possible conflict regarding Mr. Katz's representation.  It

 3    seems to me unless anyone disagrees that needs to be heard

 4    sooner rather than later, but it certainly doesn't need to be

 5    heard in the presence of everyone in the courtroom.

 6            MR. KATZ:  No, I agree with that, Your Honor, on

 7    behalf of Mr. Mohammed.  I agree completely with the Court's

 8    comments.

 9            THE COURT:  Okay.  Secondly, we have a Mr. Adnan

10    Isa's motion for dismissal of the indictment based on the

11    government's alleged -- failure to allege knowledge of the

12    illegal nature of pseudoephedrine which several people have

13    joined in.  We have a severance motion and change of venue

14    motion.  It seems to me that those could be addressed

15    separately.

16            MR. STERN:  I agree.  And those will not require

17    testimony.  I believe that the arguments will be based on the

18    facts of the case.

19            THE COURT:  I agree with that.  And disclosure of

20    grand jury proceedings.  Again, that does not require

21    testimony.  I have Mr. Aziz's motion to reserve the right to

22    file further motions.  That doesn't require testimony and we

23    have joinder.  We have Mr. Boyd's suppression motion which we

24    have discussed, his severance motion, and then we have

25    Mr. Akram's severance motion which doesn't require testimony.

UNITED STATES DISTRICT COURT

```
 1   We have Mr. Aguayo's joinder in motions which I can't -- I

 2   don't think he purports to join in the motion to suppress as

 3   to Mr. Boyd.

 4           MR. BACKMAN:  That's correct, Your Honor.

 5           THE COURT:  Rigoberto Covarrubias we have his

 6   joinder in the motion for severance.  We have Mufid Isa's

 7   joinder in motions and his own motion to suppress evidence

 8   illegally seized at residence of Mufid Isa with a request for

 9   a Franks hearing.  That doesn't implicate this witness today,

10   I take it?

11           MR. STERN:  No, it does not.

12           THE COURT:  So that has to be set for another day.

13           And then we have Fernando Valle's joinder of

14   motions.  Stephen Almasri's joinder of motions.  Isa Atrash's

15   joinder of motions.  Nabhan Isa's motion to dismiss the

16   indictment and joinder of motion to suppress evidence that

17   pertains to Mufid Isa motion to suppress as opposed to this

18   one.  We have Musbah Tarbush's joinder of motions and we seem

19   to have Rudy Hooper's joinder of motions.  Are there more

20   that I have missed?

21           MR. STERN:  I believe that's it.

22           THE COURT:  Does anyone else here know?  Yes.

23           MR. WERKSMAN:  Your Honor, Mark Werksman on behalf

24   of Adnan Isa.  I filed a motion to join the motion to

25   suppress by Mufid Isa on behalf of Adnan Isa.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  All right.  Very well.

2          MR. WERKSMAN:  That could be heard in conjunction

3    with the motion to suppress by Mufid Isa.

4          THE COURT:  Yes.  Okay.  So you have a joinder in

5    Mufid Isa's motion.  Okay.  Now, with that, it sounds to me

6    if we proceed with Mr. Boyd today, that is going to take some

7    amount of time.  I assume Ms. Barry represents Mr. Boyd?

8          MR. STERN:  No.

9          THE COURT:  I'm misremembering.

10          MR. LICHTMAN:  I do, Your Honor.  Jay Lichtman.

11          THE COURT:  Okay.  So probably we're going to use

12    a good part of the afternoon taking testimony on this matter.

13          MR. STERN:  Which is why both of us agree to the

14    extent we can release the other attorneys it may make sense

15    to do the scheduling issues first.

16          THE COURT:  Well, I agree with that.  So let's now

17    going to the scheduling issues for a minute if they're

18    independent of these.  Let me tell you right now I'm in trial

19    over in the Spring Street building.  I will not be in trial

20    Friday and my thought is I know I have a matter in the

21    afternoon Friday, but Friday morning might be an appropriate

22    time depending on counsel's availability to hear argument on

23    some of these other matters.

24          MR. STERN:  I'm actually going to be out of the

25    state on Friday.  I'll be back on Tuesday.  Some of them

1    could -- Mr. Brunwin will also be out of the state.

2    Mr. Curiel who has one of the other motions will be here and

3    available.    That would be the Mufid Isa motion and the Nabhan

4    Isa motion.

5            MR. RICHARDS:    Your Honor, with respect to Mufid

6    Isa, it would be the preference of the parties if we could

7    have three weeks to review the materials, to review a letter

8    that we're to receive asking for some additional materials

9    and I just spoke with counsel.    We believe three weeks would

10    be adequate.

11            THE COURT:    Three weeks from when?    From today for

12    the hearing on the Mufid Isa motion to suppress?

13            MR. STERN:    To the extent that the Court wants to

14    argue the motion to dismiss which Nabhan Isa filed, that I'm

15    sure could be done on Friday.

16            THE COURT:    You mean motion to dismiss the

17    indictment?

18            MR. STERN:    Yes.

19            MR. KESSEL:    Filed by Nabhan Isa.    We would be

20    prepared on Friday, Your Honor.

21            THE COURT:    Well, I'm happy -- I will tell

22    everyone that I'm not going to spend a lot of time on the

23    severance motions because I don't see a basis for severance

24    of anything at this point in time based on the papers.

25    Obviously, if someone thinks there's something of great

1    importance, I will hear from you.  As far as the motions to

2    dismiss the indictment, if we want to take those up on Friday

3    that would just be Mr. Mufid Isa's motion?  Nabhan.

4              MR. WERKSMAN:  And Adnan Isa as well, Your Honor.

5              MR. STERN:  Adnan Isa filed a separate motion

6    which I responded to.  I can either argue that today or I'm

7    assuming that Mr. Curiel could argue that on Friday as it's

8    very similar to codefendant Nabhan Isa.

9              MR. WERKSMAN:  That's correct Your Honor.

10            THE COURT:  I'm assuming as much, but let ask then

11    the counsel who would be involved in the motion to dismiss

12    the indictment whether they could be in my courtroom on

13    Spring Street Friday morning?

14            MR. WERKSMAN:  I could.  On behalf of Adnan Isa,

15    can I request that we do an expedited hearing on our motion.

16            THE COURT:  All right.

17            MR. DENIS:  On behalf of Mr. Nabhan Isa I'm from

18    Alex Kessel's office, approximately what time would the

19    hearing be held at, Your Honor?

20            THE COURT:  I'm thinking something like around

21    9:30, but I could do it later in the morning if that would be

22    agreeable.

23            MR. WERKSMAN:  Your Honor, 9:30 this Friday would

24    be agreeable for me as counsel for Mr. Adnan Isa to get

25    Mr. Isa's motion to dismiss, motion to severe, motion to

change venue, and motion for release of grand jury

transcripts.

MR. STERN:  All of which we're prepared to argue

today and have briefed.

MR. WERKSMAN:  I would happy to argue those today

as well, Your Honor.

THE COURT:  All right.  Well, let's see how we're

doing.  Let's see if we can get them both done today.  If we

can, we will.

MR. WERKSMAN:  Your Honor, I understand -- are you

planning, Your Honor, to have an evidentiary hearing on the

suppression motion prior to hearing Adnan Isa's motion to

dismiss and severe?

THE COURT:  Well, I was, but it may turn out that

I'm going to hear argument first and then proceed.  But the

problem is we need to get this witness on and I have to leave

at some stage here.

MR. STERN:  May I indicate I don't think that the

motion to suppress will affect -- the motion to suppress that

was raised by Mufid Isa, I don't think will affect the other

issues that were raised independently by Adnan Isa.  I don't

think it's going to be dependent upon the motion to suppress.

So to the extent they could easily be argued and disposed of

separately, I'm certainly willing to do that if the Court is

and if defense counsel is.

1          THE COURT:  We're getting off track here.  Let's

2    stay on track.  How long will your witness be in the Boyd

3    suppression motion, Mr. Stern?

4          MR. STERN:  My direct of the two witnesses could

5    be done in approximately 25 minutes to half an hour.  I'm

6    going to proffer the declaration that I filed as part of my

7    response.

8          THE COURT:  Mr. Lichtman, do you have any sense --

9    I realize it's unfair to have you guess at cross, but --

10         MR. LICHTMAN:  Approximate may be an hour, perhaps

11   less.  I'm prepared to -- I would join Mr. Stern in saying

12   that probably that motion, the evidentiary hearing part

13   should be done at the end of the proceedings so that other

14   counsel don't have to wait.

15         THE COURT:  I agree with that.  Now, the question

16   though is can we argue Mr. Adnan Isa's motion to dismiss the

17   indictment and motion for severance and change of venue

18   today?  And disclosure of grand jury proceedings.  It sounds

19   to me as though we might be able to get that in today, too.

20         MR. LICHTMAN:  Certainly.

21         MR. STERN:  My argument won't be extensive.  I'm

22   going to predominantly rely on my papers.

23         THE COURT:  So let's do that first, and then go to

24   taking the testimony on the motion to suppress.

25         MR. STERN:  Okay.  It's my understanding we'll do

```
 1    the scheduling and then the Adnan Isa and then the motion to

 2    suppress?

 3                THE COURT:  When you say scheduling, though,

 4    you're talking about scheduling of the subsequent motions?

 5                MR. STERN:  No.  I was talking about several

 6    defense counsel have approached me and asked me to bring to

 7    the Court's attention their interest in a continuance of the

 8    trial and the setting of different dates.

 9                THE COURT:  We'll do that first.

10                MR. STERN:  So I'm doing that.

11                THE COURT:  Okay.  We'll do that first.  All

12    right.  Why don't we take up scheduling first, and then we'll

13    go to the Adnan Isa motion, hear argument on those, and then

14    move forward.

15                MR. STERN:  All right.

16                THE COURT:  Where are we on scheduling, Mr. Stern?

17                MR. STERN:  I know that the Court set certain

18    dates in October and several of the defendants have requested

19    that they be allowed to file motions late and I have no

20    objection to those dates.  The only concern that I've got are

21    two defendants recently were indicted in the last two or

22    three weeks.  Those, I think at least one of the attorneys

23    has asked me whether or not the case will be continued and I

24    have received calls or requests from other attorneys about

25    that.  So I wanted to raise that to the Court.  If the
```

```
 1    attorneys want to speak themselves, that's fine.  If not,
 2    that's okay.
 3              THE COURT:  Well, look, here's -- I don't oppose
 4    those motions, the filing date for those motions being
 5    continued.  What I would like to see is some reasonable
 6    amount of coordination to the extent that we have multiple
 7    counsel making motions and joining in the motions.  And I'm
 8    happy to set a motion day.  I'm happy to let you all confer
 9    and come back and schedule a motion day.
10              MR. STERN:  To the extent that we have everyone
11    here, this may be a good time for at least us, the
12    government, to talk to the other attorneys if there are any
13    other specific requests for extensions of the motions.  I
14    know some attorneys expressly filed that and the Court has
15    already set the date.  If the Court and the attorneys are
16    satisfied, I'm certainly willing to stick by those dates.
17    But I don't know what the attorneys who have requested a
18    continuance for the trial want to do.  I haven't canvassed
19    all of the attorneys so I don't know their total position.
20              THE COURT:  Well, do you want to do that now?
21              MR. STERN:  Certainly.
22              THE COURT:  Can we do that quickly?  I can either
23    take a recess or I can participate in this, but I think it's
24    going to be far more effective if you all can make a proposal
25    regarding a continued trial date.
```

1      MR. STERN:  Okay.  If the Court wants to take a

2  short recess, I'll try and speak to the attorneys.

3      THE COURT:  Why don't we do that, but I would like

4  to come back out within no more than 15 minutes so I would

5  really like to get this going.

6      MR. STERN:  Certainly.

7      (Recess taken.)

8      THE CLERK:  Please come to order.  This court is

9  again in session.

10      THE COURT:  Okay.

11      MR. STERN:  All right.  Your Honor, I have spoken

12  I believe to all of the attorneys who are here.  I asked them

13  to come up and speak with me.  And if the Court would like, I

14  can go through and identify the attorney and the defendant

15  and tell you the best of my understanding to their respective

16  positions.

17      THE COURT:  All right.

18      MR. STERN:  The defendant Rudy Berreras is

19  represented by Richard Rosen.  Roger Rosen.  I'm sorry.  He's

20  new counsel on the case, he just came in, and it's my

21  understanding that he has no objection to continuing the

22  trial to next year sometime in March or April.  He would also

23  like a continuance on filing motions.  I think the consensus

24  seems be amongst the attorneys who wish a continuance that if

25  the trial gets continued to March, April or May of next year

1  that they would like to be able to file motions until

2  sometime in January.

3          THE COURT:  All right.

4          MR. STERN:  I have spoken to the attorney who is

5  standing in for Mike McDonnell who is representing Defendant

6  Khaled Shoukhah and it's my understanding that he does not

7  have an objection to a continuance of the trial.

8          MR. KENT:  That's correct.  Jeff Kent on behalf of

9  my partner Mike McDonnell.

10         THE COURT:  Well, rather than going through 40

11 individuals, why don't we establish who doesn't have an

12 objection and who does.

13         MR. STERN:  All right.  I'll just go through and

14 tell you who does and does not according to the list that I

15 wrote down.

16         THE COURT:  Fine.

17         MR. STERN:  Okay.  Shoukhah does not have an

18 objection.  Defendant Said Abdelaziz does not have an

19 objection.  Defendant Abdallah Ayeh does have an objection,

20 but his attorney was just appointed and indicated he would

21 like time to read the discovery.  Mahmoud Khattab does not

22 have an objection.  Rasheed Aziz does not have an objection

23 to continuance of the trial.  Patrick Boyd does not have an

24 objection to a continuance.  Akram Omar does have an

25 objection.  Musbah Tarbush has no objection.  Ferras Sallal

```
 1    has no objection.  Stephen Almasri has no objection.  Tawfiq
 2    Musitef does object.  Ahmad Jaris has no objection.  Carlos
 3    Aguayo has no objection.  Amjad Ayeh has no objection, but if
 4    it's going to be continued, he'd like late April.  I'm sorry.
 5    He has an objection, but if he's going to be continued, he
 6    would like late April.
 7              THE COURT:  All right.  Thank you.
 8              MR. STERN:  Khalil Mohammed has no objection.
 9    Mufid Isa does object.  Alfonso Pelayo has no objection to a
10    trial continuance.  Nabhan Isa has no objection.  Adnan Isa
11    does object.  And Mohammad Eses has no objection.  Those are
12    the attorneys who represented the defendants with whom I have
13    spoken.  Christian Boyd has no objection.  Patrick Boyd.
14              THE COURT:  I'm sorry, Ms. Barry?
15              MS. BARRY:  I didn't hear him say Patrick Boyd,
16    but he has no objection.
17              THE COURT:  Patrick Boyd has no objection either.
18    So effectively of the people with whom you have spoken, I
19    think six objections.
20              MR. STERN:  Your Honor, I have just been told by
21    one of the attorneys for Nabhan Isa that now he would like to
22    object.
23              THE COURT:  All right.
24              MR. STERN:  And the consensus among the attorneys
25    when we were speaking was sometime between March and May of
```

```
 1   next year.  As I said motions in January.
 2              THE COURT:  All right.  Now, the government's last
 3   estimate was what?
 4              MR. STERN:  12 weeks.
 5              THE COURT:  12 weeks.  All right.  Well, I think
 6   everyone may assume knowing me that there will not be a
 7   12-week trial because we'll be on time limits if that's the
 8   circumstance so it may be 8 weeks, but it's definitely not
 9   going to be 12 and we just have to see how it works out,
10   but --
11              MR. STERN:  I think that to the extent that there
12   are going to be pleas, I think that that would certainly
13   reduce my estimate.  The estimate that I gave was for all
14   defendants going to trial.
15              THE COURT:  I understand.  Yes.
16              MR. WERKSMAN:  Mark Werksman on behalf of Adnan
17   Isa, Your Honor.  I would like an opportunity to articulate
18   to the Court why my client Adnan Isa would object to a
19   continuance.  The way this is being framed and projected to
20   the Court is exactly why this case should be tried promptly
21   or severances should be granted, Your Honor.  The government
22   has brought upon this Court and upon the defendants an
23   unwieldy number of defendants with disparity issues that
24   range from all kinds of issues because the defendants'
25   actions are so factually dispersed throughout this massive
```

1  indictment.  And so Your Honor, rather than having our

2  individual defendants dragged along in a process where

3  they're dehumanized, they're depersonalized, or worn out by

4  having to have a client remain in custody -- he's been in

5  custody for 7 months now.

6          THE COURT:  We know that.  Now make your point.

7          MR. WERKSMAN:  And will have to remain in custody

8  for another 7 or 8 months if a continuance is granted over

9  his objection, I say, Your Honor, that perhaps to put the

10  onus on the government to break this case down in a

11  meaningful way so that it can be litigated expeditiously and

12  appropriately.  For example, Your Honor, there are many

13  defendants who are alleged to have committed very few

14  specific acts within an otherwise massive, far-reaching

15  conspiracy.

16          An example would be my client who allegedly

17  transacted 30 or 40 cases of this otherwise perfectly legal

18  substance called pseudoephedrine and he is accused of

19  participating in this one transaction.  It's named in one of

20  the overt acts in connection with this massive, far-reaching

21  conspiracy that spreads throughout the country, involves 37

22  other people, et cetera, et cetera.  There are other

23  defendants who are similarly situated.  They are charged with

24  very discrete particular transactions that they now find

25  themselves being swept away in this raging river of

1  defendants in this massive dump truck of a conspiracy

2  indictment.

3       I suggest, Your Honor, that those defendants, like

4  my client, who allegedly did one thing in connection with

5  this otherwise far-reaching, coast-to-coast, year long

6  massive indictment, conspiracy, that those defendants be

7  severed.  Let us have our trials promptly and expeditiously

8  and fairly so that people like him, these little guys, don't

9  have to sit in custody for a year while there are 37 other

10  defendants paraded.  We're ready for trial.

11       THE COURT:  Please sit down.  I understand you

12  have an important point to make, but the fact of the matter

13  is I am going to have to schedule the trial, and then take up

14  motions for severance separately and they may -- we may have

15  to schedule the trial differently.

16       Right now I've indicated I do not see a basis for

17  severance in this case.  I'm not saying I won't as I become

18  more familiar with the case, but right now, I am simply not

19  in a position to grant a severance motion.  I understand that

20  if I continue the trial to March, April or May, it will be

21  over your client's objection and over the objection of other

22  people and their speedy trial rights.  That's all I'm trying

23  to deal with right now.

24       MR. WERKSMAN:  Oh, I understand that, Your Honor.

25  And I know that this Court is scheduled to hear my motion for

1    a severance and dismiss and other things later perhaps after

2    we resolve the schedule issues.  I'm raising this point as an

3    objection to the continuance.

4            THE COURT:  I understand.

5            MR. WERKSMAN:  Of a young man who has been in

6    custody already for 7 months.

7            THE COURT:  I understand.

8            MR. WERKSMAN:  And now must agree or be dragged

9    along unwillingly for another 7 months because the government

10   chose to put him in a case with 36 defendants and none of

11   them are going to be ready on October 15th.

12           THE COURT:  All right.  Thank you.

13           MR. WERKSMAN:  Submitted, Your Honor.

14           MR. KATZ:  Your Honor, just for the record on

15   behalf of Khalil Mohammed, David Katz.  We would join in

16   Mr. Werksman's motion and ask that at least those seven who

17   have objected, those seven who have indicated they're ready

18   to go earlier that those seven be allowed to go to trial and

19   be severed from Mr. Khalil Mohammed and the others.

20           THE COURT:  I understand.  I had not understood

21   that Mr. Mohammed joined in the objection.  Does he?

22           MR. KATZ:  Your Honor, he is willing to have his

23   trial go over to March, but it would be his request, like

24   Mr. Werksman, that even though he's not objecting, that those

25   who are objecting be granted their severance.

```
1              THE COURT:  I see.  Thank you.  Mr. Potter.
2              MR. POTTER:  Mr. Ayeh, Your Honor, joins in both
3     the content and the tone of Mr. Werksman's comments.
4              THE COURT:  Fine.  Thank you.
5              THE COURT REPORTER:  I'm sorry.  I can't hear,
6     Your Honor.
7              THE COURT:  We're going to have to do this in an
8     orderly fashion or we won't have a record.  That's one of the
9     reasons why I am just not going to let everyone have an
10    unfettered opportunity to engage in a soliloquy today because
11    it's too hard on the reporter and we have too much to get
12    done.
13             MR. NEWMAN:  Mr. Newman for Mr. Omar, Your Honor,
14    joins.
15             THE COURT:  Yes, Mr. Richards.
16             MR. RICHARDS:  On behalf of Mr. Mufid Isa, he
17    objects as well.  All I'm requesting shortly that you would
18    allow us to at least tailor what exclusions under 3161 H the
19    Court would be relying on so we could just make any
20    appropriate objections so the record will be clear.
21    Especially, if it's under the interest of justice exclusion.
22             THE COURT:  I understand.  Look, here is the
23    problem.  I have, as you know, Mr. Richards, I have another
24    matter that is also a 12-week estimate that is set for trial
25    in October which is earlier indicted than this case.  And I
```

```
 1    am, my own schedule appears to be such that it's going to be
 2    very difficult for me to try this case this year and I think
 3    it is going to have to be tried early next year because I do
 4    not have availability unless we have someone who comes in
 5    from out of district to try the case.
 6              MR. RICHARDS:  I agree with the Court because I
 7    know since I'm on that case those defendants will be going to
 8    trial as well.  The only suggestion that I would make is the
 9    objecting defendants that are being carried over if the Court
10    finds excludable time, the 3161 H(7) allows the carry over if
11    there's no motion for severance pending which of course puts
12    the Court in a Catch-22 because once the motions for
13    severance are filed then that is excludable time as well.  I
14    understand that the Court wants to give the government a
15    chance to make argument on those motions.
16              I think that as to some -- I don't think there's
17    any attorneys on this case that are in that other case, but
18    there may be, but there would obviously be an unavailability
19    of counsel exclusion if that occurs.  I just think that
20    Mr. Werksman has a good point in that there may be some sort
21    of hybrid remedy that would allow a smaller trial to the
22    defendants that want to go.  Of course if this Court would be
23    unavailable in this case, it would be sent to Judge Kelleher
24    or some other semi-retired judge, I would rather wait and
25    have -- you know till this Court is available.
```

1    THE COURT:  Well, we're not going to engage in

2    court shopping.  We are going to have to deal with where we

3    are.  This case cannot be tried this year based upon my

4    existing calendar whether it's 12 weeks or 8 weeks.  I

5    understand that Mr. Werksman is making objections that are

6    important as to his client.  If I were in his shoes, I'd be

7    making the same objections.

8        But having said that, I really cannot deal with

9    this today because today the only I can tell you all is that

10   I cannot try this case in October.  And Mr. Galvez, I don't

11   know if you have the full calendar here or not, that's the

12   problem of moving to this courtroom, but I suspect it's going

13   to be very hard at any time before March next year for me to

14   segment out sufficient time to try this case.

15       MR. RICHARDS:  Your Honor, respectfully, I just

16   want to tell the Court that it is unusual this Court has two

17   of the largest conspiracies in the Central District.  I don't

18   know maybe it was bad luck of the draw, but I will tell the

19   Court that I have researched this issue.  The case law does

20   provide that the Court could send the case back to the wheel

21   to be farmed out to an available court.  It's not forum

22   shopping.

23       THE COURT:  Mr. Richards, you're inappropriate and

24   forget it.  I took this case on a low number because it

25   properly came to me on a low number and I can assure you this

1    District does not permit people to send cases back.  You may

2    think so, but don't get involved in that.  That's a place

3    where you just simply should not mix in.

4              MR. RICHARDS:  No, what I meant is if the Court

5    had two trials starting the same day, the remedy is not to

6    keep --

7              THE COURT:  Thank you, Mr. Richards.  All right.

8    Now, what do we have in March, Maynor, can you tell?  I am

9    prepared based on scheduling and what I know my schedule to

10   be to continue this matter to March 18th.  I am mindful of

11   the concerns that have been voiced and I will let them be

12   voiced in terms of the motions to severe, but it looks to me

13   like March 18th is the appropriate date.

14             MR. BACKMAN:  Your Honor, Larry Backman on behalf

15   of Carlos Aguayo.  I have the Nazi Low Rider case scheduled

16   for trial for that same date before Judge Hatter.

17             THE COURT:  All right.  We'll deal with it when we

18   get there.

19             MR. STERN:  Your Honor, may I indicate that it's

20   my understanding that the Court is then going to grant a

21   continuance.  And if I may, I'd like to file the paperwork

22   which will set out the legal basis and standard that the

23   Court should consider in making that decision.  And I'm

24   assuming that in large part the Court's decision to grant the

25   continuance is based on the request of many defendants to

```
 1   grant such continuance.

 2           THE COURT:  Well, the agreement of many defendants

 3   to grant the continuance.  The fact that we have motions

 4   pending and finally, because of the Court's own schedule, I

 5   would make a finding in the interest of justice that it's

 6   appropriate to continue.

 7           MR. STERN:  I can indicate that several of the

 8   defendants affirmatively asked for more time because there is

 9   a plethora of material including a set of wire tap tapes

10   that's going to be coming from Chicago which has literally

11   tens of thousands of calls on it that I'm going to disclose.

12           THE COURT:  I understand.

13           MR. STERN:  But I will then fill out the paperwork

14   and ask the Court to consider that in its ruling.

15           THE COURT:  Thank you.  All right.  Now, as far as

16   further motions, we need a further motion hearing date

17   because what I would like to do is to pick a day where or a

18   2-day period perhaps where we do nothing but hear motions and

19   I'm thinking that the time to do that would be in January.

20           MR. STERN:  That's what the attorneys who have

21   thought about it have suggested as well.

22           THE COURT:  Why don't we take a Thursday and

23   Friday in January, Maynor.  We're going to set the motions at

24   9:00 a.m.  It will be the 16th and 17th; is that correct,

25   2003?  January 16 and 17, 2003.  And that means that I want
```

UNITED STATES DISTRICT COURT

```
1    all motions on file 4 weeks in advance of that date.

2    Oppositions --

3              MR. STERN:  Your Honor, may I, I would request

4    4 weeks if there are a lot of oppositions to be able to

5    answer them.

6              THE COURT:  Well, then we better put them on

7    earlier than that.  Let's say that all motions will be filed

8    by December, let's say December 1st, which date is that?

9              THE CLERK:  Sunday.

10             THE COURT:  Good.  Let's say all motions will be

11   filed by December 3rd.  Oppositions will be due, what is the

12   first workday in January?  January 2nd.  All replies let's

13   say by January 9th.  So let's do that.  Well, we'll need a

14   status conference probably 30 days before trial.

15             MR. RICHARDS:  Your Honor, excuse me for 1 minute.

16   On the findings that my colleague Mr. Stern said he would be

17   providing on the speedy trial issue, would the Court mind

18   before it signs them giving defense counsel a week to lodge

19   objections because part of the motions that we would have, of

20   course, would be speedy trial motions by that time so I just

21   want there to be some continuity if that's okay with the

22   Court.  Usually the government prepares these findings and

23   they get signed before we could ever object to them.

24             THE COURT:  Well, I'm assuming your objections are

25   on the record in any event.
```

1          MR. RICHARDS:  Well, but I don't have the benefit

2     of -- the procedure usually is they send out these findings

3     that cover a broad range of exclusions.  There is no way for

4     the record to show any input.  I don't know what they're all

5     going to be and I don't want to take up the Court's time now

6     with argument on it.  I would rather just submit written

7     authority as to why some of the exclusions may be

8     inappropriate so they're preserved at the time they're made.

9          THE COURT:  All right.  Here's what I'm going to

10    do.  Mr. Stern, I had thought you were filing a brief and not

11    proposed findings, but since everyone assumes you're going to

12    be filing proposed findings, why don't you file proposed

13    findings, and then the defendants may file a joint single

14    document set of objections and anyone who wants to weigh in

15    on it and sign in on it may, but I think to have 78 sets of

16    objections is just not going to work.

17         MR. STERN:  I will file a brief with proposed

18    findings.  I won't be able to do it in the remainder of this

19    week because I will be out of town, but I will try and do it

20    next week.

21         MR. RICHARDS:  Can I volunteer to have my firm be

22    the clearing house for that joint objection?

23         MR. WERKSMAN:  Your Honor, on behalf of Adnan Isa,

24    I would like the opportunity to raise any objections that I

25    can or want to if and when I receive something from

```
1     Mr. Stern.

2              THE COURT:  Fine.

3              MR. WERKSMAN:  I would like to also have my

4     objections here in court part of the record and not to be

5     deemed to have waived them if for any reason his order slips

6     past my ability to respond because I will be on vacation.

7     And finally, I would like an opportunity to be heard

8     individually not with all due respect, I appreciate counsel

9     here trying to act as a clearinghouse, but I'm -- I think

10    especially given the extremely vast nature of this

11    litigation, I want to look out for my client's interests

12    individually.

13             THE COURT:  Well, here's what we're going to do

14    then.  I'm going to ask Mr. Stern to file his brief and

15    proposed findings, and anyone who wishes to object may file a

16    written objection within 7 days thereafter.

17             MR. STERN:  I'll serve all counsel.

18             THE COURT:  And then I will reserve the right to

19    decide later if we need a hearing for any purpose.  Okay.

20    Thank you.

21             MR. KATZ:  Your Honor, on behalf of Khalil

22    Mohammed, David Katz.  I just did want to put one thing on

23    the record that may obviate the need for several objections

24    by several counsel.  We is certainly don't believe that it's

25    a proper basis for excludable time under the Speedy Trial Act
```

UNITED STATES DISTRICT COURT

that the government 6 months after the case is indicted has

yet to provide us with key discovery, namely wire taps that

are relevant to this case, although they happen to have been

made in Chicago.  So that would be the basis for our

objection right now and that should not be a part of any

speedy trial order in our opinion.

THE COURT:  All right.  That's noted for the

record.  Okay.  Now, so we've resolved the finding.  What

other scheduling issues do we have, Mr. Stern?

MR. STERN:  I believe that those are the

scheduling issues.  We've determined the trial date, the

motions, status conference.

THE COURT:  Fine.  Then I think what we should do

next.

MR. CURIEL:  Your Honor, with respect to the

motions to suppress evidence filed by Mufid Isa and joined by

the other Isa brothers, I spoke with counsel and they would

like the matter to be continued till the end of August or the

beginning of September.

THE COURT:  What would be your estimate on that

motion in terms of time?  Half day?

MR. CURIEL:  Half day would be adequate.  I only

have one witness at this time that I would be calling.

THE COURT:  Okay.  What do we have at the end of

August?  I think we should take a Friday at 1 o'clock.

```
 1        MR. CURIEL:  August 30th would be fine with the
 2   government and I believe counsel as well.
 3        THE COURT:  Friday, August 30th at 1:00 p.m. will
 4   be the motion, the continued date of Mufid Isa's motion to
 5   suppress evidence illegally seized at his residence and his
 6   request for a Franks hearing.  And my question is if I were
 7   to, and I'm not saying I am going to, but if I determine a
 8   Franks hearing is appropriate is half day enough?  I bet not.
 9        MR. CURIEL:  Your Honor, I think it could extend
10   it not much more than half a day, but would the Court be
11   making that determination prior to August 30th or after or on
12   August 30th?
13        THE COURT:  You know, I really can't tell right
14   now, but let's set it at 9:00 in the morning on August 30th
15   just to have the full day if we need it.
16        MR. CURIEL:  That's fine, Your Honor.  Thank you.
17        THE COURT:  So 9:00 a.m. August 30th on the motion
18   to suppress.  I moved it up to 9:00 in morning in case there
19   is a Franks hearing because we'll then need more time.
20        MR. RICHARDS:  Your Honor, on that date since we
21   have it reserved for a motion, there is one issue that I
22   wanted to alert the Court about to get this out of the way.
23   The wire taps that are forthcoming from the government are in
24   Arabic and in a multi-defendant Israeli case I have in front
25   of Judge Morrow that I was on before, this issue came up
```

```
 1    because all the language is in Arabic.  There's going to be
 2    some authority provided the Court that these defendants are
 3    entitled with their lawyers to have some of these
 4    transcribed, the pertinent calls, because obviously we can't
 5    understand the Arabic and we need to know what is being said.
 6         I would recommend that we have that motion heard
 7    and I can get it on file very quickly on August 30th.  If we
 8    wait till the current motion date, I'm anticipating everybody
 9    is going to need a continuance at that point because it's an
10    arduous task to have all these tapes transcribed from Arabic
11    to English.  And the defense attorneys need to be able to
12    hear what's on them as well as the defendants that don't
13    speak English need to be able to translate, to interpret
14    which just takes a long time our clients are in custody.
15         Would the Court mind hearing that motion which
16    would be a motion to transcribe the wire taps from Arabic to
17    English, and I can represent to the Court that Judge Morrow
18    heard a very similar motion from Hebrew to English and it's
19    important to hear that at that time.
20         THE COURT:  Well, I must tell you I've not had one
21    of these cases where the tapes aren't transcribed so they're
22    in a language that someone can understand, but my question is
23    they're in Arabic.  Your clients should be able to understand
24    them.  The problem is the lawyer, isn't it?
25         MR. RICHARDS:  Well, no.  The problem turned out
```

1    let's say I give all the tapes to my client.  He can

2    understand the Arabic, but his English is so poor that he

3    can't explain to me what's on the tape and so then he uses

4    the interpreter to explain his version of what the

5    conversation.  And unfortunately, a lot of times there's a

6    dispute as to what they meant because some words like in

7    English are slang and so in the Israeli case, Judge Morrow

8    approved CJA funds to have a paralegal and an interpreter to

9    the defendants that needed these calls transcribed.  And

10    there's good authority on this.  Not every call needs to be

11    transcribed, but the pertinent calls and it's impossible for

12    us to flush through the calls that we made need or calls that

13    are exculpatory.

14         THE COURT:  Well, I know there's authority.

15    Mr. Stern, what are we going to do about translating in terms

16    of timing because that's going to be the issue?

17         MR. STERN:  Well, the government will prior to

18    trial translate the calls that we're obviously going to use.

19         THE COURT:  But that's not going to help us here.

20         MR. STERN:  The government is not going to go

21    through -- I mean there are literally tens of thousands of

22    calls.  I will certainly provide defense counsel with CDs

23    that have the calls and normally, retained counsel hire their

24    own interpreters if they wish to have them transcribed.

25         THE COURT:  Usually they do as a group and get

1    things done, but here's the problem.  We are going to have

2    disputes the rest of our lives over what was on those tapes

3    as we do in every single case and you're going to have your

4    expert, they're going to have their expert, and we've got to

5    have some sort of system in place to deal with this now.

6         MR. STERN:  Normally, what I do is I have them

7    transcribed and I provide those transcripts along with the

8    tapes or in this case the CDs to defense counsel.  Routinely,

9    then they go to their clients and ask them whether or not

10   they're accurate.  And if there's some dispute, they normally

11   come back to me and say I think this portion is inaccurate

12   and I normally then check that out.

13        THE COURT:  And by when will they be transcribed?

14        MR. STERN:  The ones the government's going to

15   use?  I'm assuming that they will be transcribed in early

16   January.  By the motion date I think we can get most of them

17   transcribed.

18        THE COURT:  Okay.  Well, Mr. Richards has a

19   different issue.

20        MR. RICHARDS:  Your Honor, the problem with that

21   is see what the government will do is they'll take the cream

22   of the calls and just use the calls that they want to admit

23   at trial.  They don't expect a jury to sit here and listen to

24   5,000 calls.  They'll take the best calls.

25        THE COURT:  So you want CJA funds to have certain

UNITED STATES DISTRICT COURT

1    additional transcripts transcribed?

2             MR. RICHARDS:  And also there is a lot of Rule 16

3    evidence in those tapes that will materially assist the

4    defense.  Because my client is on the phone talking about his

5    liquor store that shows he's in the liquor business.  The

6    reason why the government's remedy isn't going to help the

7    defense is they're only going to take the calls that they

8    think are inculpatory.

9             If we can have a paralegal and an interpreter go

10   down and listen to the calls at MDC in the computer they have

11   just recently provided, the lawyer doesn't sit there all day

12   long for 8 hours a day.  It would take us the rest of the

13   year to go through every call so we usually employ a

14   paralegal to go with the client and then they highlight the

15   calls they want and allows the defendant who is sitting there

16   anyway to listen to all these calls, but it takes hours and

17   hours to do this.

18            THE COURT:  I am well aware of that.  What is your

19   point?  What are you really telling me?

20            MR. RICHARDS:  My point is that what we did in the

21   other case after we got over the government's objections, I

22   understand they don't want to give us any calls that may help

23   the defense.  What we do is the court authorized CJA funds

24   for a paralegal and have the interpreters, numerous, like a

25   pool of them, go down and meet with each defendant and allow

them access to the tapes.  And the fact that some of the
defendants have private attorneys was irrelevant because most
of the time after they retained private counsel, they become
indigent.  There wasn't an issue in that case that the
defense had to go out and hire more interpreters.  It's very,
very costly.  So they used the court interpreters to allow
access.

The other thing they did is once the defense
designated a certain call to the government, then the
government -- it was the government's obligation after the
defense designated the call, then do that dual transcription
where there's English and Arabic and provide a sheet.  That's
how they normally do it with the calls they're going to use
where you have Arabic on one side and the English on the
other and the call number.

THE COURT:  No, I know how they do translations.
Time is short.  I don't need these side trips today.
Mr. Werksman, what do you want to say?

MR. WERKSMAN:  I want to join in Mr. Richards'
request, but I want to make it more particular and perhaps
actually broader.  The government should provide complete
transcripts with complete interpretations for all of us.
This is one of the problems and this is not my severance
motion, Your Honor.  I'll get a chance to argue that
eventually.  This is one of the problems.  The government

1    chose to indict 37 people and have 500,000 pages of

2    discovery.  My client didn't ask to be part of this.  He's

3    now being forced to litigate in this environment.

4         We should get a full set of discovery that's

5    comprehensible to us that we can provide effective

6    representation of our clients.  It's simply prejudicial and

7    overwhelming even for private counsel to be told well, you

8    can go out and hire an interpreter and interpret the ones you

9    want.  No defendant here, only Bill Gates could afford to

10   privately interpret and transcribe every piece of discovery

11   that the government's given us.  It's unrealistic and

12   inappropriate.

13        The government has placed us at this severe

14   disadvantage, Your Honor, by putting us in this massive case.

15   It's the government's burden to make sure we have discovery

16   that's comprehensible and that's useful to us.  So I submit

17   that this Court should make a series of orders.  Number 1 is

18   if we're really going to go forward and litigate this case in

19   a timely fashion given the delay the Court's going to grant,

20   there should be no more superseding indictments.  We should

21   not be subjected to finding out that they decided to add

22   another dozen defendants this fall.

23        We shouldn't have to wait until January to get a

24   call from Copy Pro to say Mr. Werksman we have another 9,000

25   pages.  We need another $1200 and it's all in Arabic.

```
 1    Because, you know, what's going to happen, Judge, we're all

 2    going to be sitting here in February saying we can't go to

 3    trial in March.  And then I'll be asking again to go to trial

 4    at the date that the Court sets and the other 36 defendants

 5    are going to want a continuance to next October because the

 6    government will have dumped 10,000 new pages of stuff they

 7    just got from Chicago.

 8            So here's the problem, Your Honor.  There's too

 9    much that's coming for too long and there's no end in sight.

10    This prosecution chose to put Your Honor and these defendants

11    in this predicament.  The government has within its power the

12    finances, the resources, and the manpower to solve this

13    problem in a number of ways.  Number 1 is they could divide

14    this case into 5 or 6 workable, discrete --

15            THE COURT:  I've heard that one.  Move on.

16            MR. WERKSMAN:  And I hope the Court grants that

17    motion at the time.  The second thing the government can do

18    is they can stop bringing on discovery.  They can give us

19    everything they've got now, pronto, right away so that we can

20    make use of it in time for trial that's now already 7 or

21    8 months away.  And the next thing they could do, Your Honor,

22    is they can transcribe and interpret all these tapes for us.

23    I must tell you, Your Honor, I've been in this case from the

24    beginning.  I get these faxes from a guy named Bob over at

25    Copy Pro, and there's this bewildering quantity of discovery
```

1    that's never ending.

2            THE COURT:  Well, you've just been in different

3    courtrooms I guess than everyone else here.  So the fact of

4    the matter is I understand your concern and I understand that

5    you want the transcripts in a timely fashion.  I also

6    understand that I'm going to have authorize some CJA monies

7    and your objections are noted for the record.

8            MR. WERKSMAN:  Maybe we can compromise.  Let the

9    government give us the interpretations.

10            THE COURT:  Well, but that is not going to advance

11    the ball for one moment because they'll give you

12    interpretations and then we'll still be back in the soup.

13    You might as well have interpretations that you can rely on

14    and if they have to be done with CJA funds, so be it.

15            MR. BACKMAN:  Your Honor, Larry Backman on behalf

16    of Mr. Garcia Aguayo and Mr. Fernando Valle.  They're Spanish

17    speaking.  I'm really not interested in the Arabic

18    translation.  I'm happy with the scheduling dates.  I'd like

19    to reserve my motions until the new motion date.  I'd like to

20    be excused.

21            THE COURT:  You may be.

22            MR. BACKMAN:  Thank you, Your Honor.  May my

23    clients be excused as well?

24            THE COURT:  They may.

25            MR. RICHARDS:  Your Honor, that may help the

1    immediacy of this is the agents have a word search program

2    that they have used with the line sheets.  If the Court can

3    order the agent to provide what word processing program

4    they're using in a diskette or CD of the actual line sheets

5    and how they're using their word search command that will

6    greatly expedite defense counsel's ability to pull out key

7    calls for their own clients.  We can type in the name of the

8    client and certain words and that will segregate the calls.

9    They make agent available to us with an order, that's one

10   thing we can do.

11        MR. KATZ:  Your Honor, on behalf of Khalil

12   Mohammed, if I could just add, the scope of the problem is

13   even worse than Mr. Werksman was describing it.  They are

14   supposed to be over 1200 telephone calls alone on which he is

15   intercepted.  In addition to that, we were just told today

16   that tens of thousands of calls are coming in from Chicago.

17   On top of that there are still other cassette tapes, there

18   are --

19        THE COURT:  So there are lots of calls.  I don't

20   mean to interrupt, but now what do you want me to do?

21        MR. KATZ:  Well, Your Honor, I would join

22   Mr. Werksman's request.  I think that the government should

23   do two things.  Number 1 they should translate and transcribe

24   all of the tapes.

25        THE COURT:  The answer to that is I'm not going to

1    order it.

2          MR. KATZ:  And the second thing, Your Honor, is

3    that they should give us whatever kind of search engine

4    capability they have to put this stuff on search engine where

5    we can search under certain names or under certain words,

6    Your Honor.

7          THE COURT:  If that can be done without

8    compromising the government's position and if that can be

9    done consensually, I would be in favor of it.  But I have no

10   idea of what the search engine is right now and I'm not that

11   good with computers.  So let me hear from the government on

12   that when you're finished.

13         MR. KATZ:  I just wanted the Court to know that

14   we've spent thousands and thousands of dollars already and

15   Mr. Mohammed cannot listen to the tapes in custody.  And

16   problem with that, Your Honor, is they have to be on a

17   different format than what they are now.  He could play them

18   on like a boom box if they were put into that format by the

19   government.  So our request would be that the government put

20   them in the format, I think it's called a wave.  They put

21   them in a format where he can play them over at the MDC

22   because trying to use one computer and it's only computer

23   that's available all day long for all the people, not just in

24   our case, but in every single case that's indicted in this

25   District is onerous and impossible.  But if we had them in

```
 1    the other format, he could go through them hour after hour

 2    while he's in custody.  Thank you.

 3              THE COURT:  Thank you.

 4              MR. WERKSMAN:  Your Honor, could I make one last

 5    request regarding scheduling?  If the Court is going to

 6    continue the trial, I would personally request, if the Court

 7    is not going to severe Mr. Isa and have our trial

 8    October 15th as per our request, would the Court set the

 9    trial date on April 8th because of my trial schedule?

10              MR. STERN:  I have no objection to that.

11              THE COURT:  What's going on on April 8th, Maynor?

12              April 8th, block that out.  So the other dates I

13    want the other dates to remain in place, though, because if

14    other problems can arise, they will.  So let's make the trial

15    April 8th with the understanding that the other dates I have

16    set will remain in place.  Okay.

17              MR. RUBIN:  Did you ever give times for the

18    motions or for the trial?  I never heard you mention any

19    times.

20              THE COURT:  The trial 9:30 the first day.

21    Thereafter, we'll see.  The motions that we have set so far

22    to be heard at 9:00 a.m. on Friday, August 30th.  Mr. Stern?

23              MR. STERN:  Yes.

24              MR. RUBIN:  Didn't Your Honor also set a

25    January 16th, January 17th motion date?
```

```
1          MR. STERN:  I thought that was 9:00 a.m.

2          THE COURT:  It was.

3          MR. STERN:  With respect to defense counsel or

4   several defense counsel's request that the government

5   transcribe every call that is in Arabic, it simply isn't

6   feasible.

7          THE COURT:  I'm not going to ask you to do that.

8   My question now is the engine.  Is there some more compatible

9   way the transcripts can be delivered so that they're more

10  easily accessible?

11         MR. STERN:  We have been delivering them instead

12  of giving hundreds or thousands of tapes as we normally do,

13  we have them all on compact disks so a single CD can have

14  thousands of conversations on it.  Now, from that defense

15  counsel can presumably put it into whatever format it wants.

16  I am not an expert at computers so I don't know, but if there

17  is a problem with the defendants listening to them on the CD,

18  then that should be discussed with MDC to find out how the

19  defendants can do that.  Because as I think one defense

20  counsel said a simple boom box, I think a compact disk player

21  will allow them to actually listen to it.

22         MR. KATZ:  No, no, Your Honor.

23         THE COURT:  Well, look, let me suggest this.  I'm

24  not going to get into all the details because I just

25  customarily don't get into those details.  I am going to
```

first of all figure out when it is Mr. Stern thinks he's

going produce the tapes he has.  Secondly, I'm going to

figure out how to get CJA funds so the defense counsel can

arrange to do their own translation.  And those as far as my

concern major issues that I have to deal with today.  There

may be other problems that arise down the road.  I'm not

foreclosing the subject forever, but I am not going to order

a translation or a tape disbursement system inconsistent with

anything any other federal judge in the world has ever done.

MR. STERN:  Now, let me say this.  The Los Angeles

wire taps have already been disclosed on compact disks.  I

recently received those that were done in Chicago.  They're

being copied and within the next two weeks I should have

those ready for disclosure.

THE COURT:  I think the faster you can get them

over, the better off everyone will be.

MR. STERN:  Certainly.  And with respect to CJA

funds, it's always been my understanding that retained --

defendants who retain counsel utilize their own resources.

THE COURT:  There are circumstances where retained

counsel come to the court and say it's too onerous for their

client, but I am not going to have CJA funds so every single

defense lawyer in the room can go out and get his own

interpreter.  We're going to have to have some joint effort

to get these transcripts translated by mutually agreeable

1    interpreters at least for the most part because we're not

2    going -- I'm not going to authorize their being duplicated

3    and translated 39 separate times.

4            MR. RICHARDS:  Your Honor, a simple solution is to

5    have the case agent available at the U.S. Attorney's Office

6    for defense counsel because they won't talk to us.

7            THE COURT:  Mr. Richards, I'm not going to do

8    that.  We're going to do this the way it has been done in the

9    past.  We are not going to create a new civil discovery

10   obligation here so that's that.  Now, I will take a look.

11   I'm glad you brought Judge Morrow's order to my attention.  I

12   will see if I can't get a copy of it, take a look at it, and

13   see exactly what she did and see if it makes some sense.

14           MR. RICHARDS:  I have it if you need it.

15           THE COURT:  Fine.  If you want to give it to

16   Mr. Galvez when we adjourn, be my guest.

17           Okay.  Now, we have next.

18           THE CLERK:  We need a status conference 30.

19           THE COURT:  Okay.  If the trial is April 8th,

20   let's set the status conference 30 days before.  Friday,

21   March 7 is the status conference at 9:00 a.m.

22           Okay.  Now, does that take us to argument on

23   Mr. Isa's motion to dismiss the indictment?

24           MR. STERN:  Nabhan Isa or Adnan Isa?

25           THE COURT:  Adnan Isa.  Is that the one you wanted

1   to argue today?

2           MR. STERN:  I'm willing to argue that as well as

3   the others.  In a single motion he raised 4 or 5 issues.  I

4   can argue all those.

5           THE COURT:  The papers are quite detailed so I'm

6   going to give each side 15 minutes to argue it, and then

7   we'll go to the suppression hearing.

8           MR. STERN:  Although, I think Mr. Isa's counsel

9   already argued his motion to severe.  Would you like me to

10  simply to respond to that?

11          THE COURT:  Mr. Werksman is not going to concede

12  that so I'm going to give each side 15 minutes and we'll go

13  there.  So now are we dealing -- just so we're all clear, we

14  are currently addressing Mr. Adnan Isa's motion to dismiss

15  the indictment based upon the government's failure to allege

16  knowledge of an illegal nature of the pseudoephedrine,

17  severance, change of venue and disclosure of grand jury

18  proceedings?

19          MR. STERN:  Yes, I'm prepared to respond to those.

20          THE COURT:  Okay.  Then why don't we let

21  Mr. Werksman go ahead since it's his motion.

22          MR. WERKSMAN:  First of all, Your Honor, thank you

23  for giving me an opportunity to be heard.  I'd like to make a

24  point to this Court that supports my motion for severance.

25  I'm not allowed to have my client join me here at the lectern

1    because this Nuremberg-style case arrangement we have here

2    prohibits an individual defendant from coming down here

3    because of security reasons which are legitimate when you put

4    this many people in custody in one room.  This is part of the

5    prejudice, Your Honor, that my client suffers as a result of

6    this omnibus, massive, far-reaching indictment process.

7         It's clear and it's also -- it's subtle in ways

8    that will eventually, Your Honor, I'm sure prejudice my

9    client before a jury.  He is dehumanized.  He is forced to

10   litigate in an impersonal environment, he's separated from

11   counsel, he can't be with me at the lectern, and he is one of

12   dozens of faces that will blur in the eyes of any prospective

13   jury.  And perhaps I know that this Court is trying mightily

14   to view each defendant as an individual, but this Court can

15   only be influenced by the massive number of defendants

16   present in this courtroom because it places time constraints

17   on it, it places security constraints on us, and we can't

18   have the benefit of being with our clients and having them

19   stand before the Court like any other defendant as a human

20   being seeking justice.

21         Instead we have to be at a distance and this

22   courtroom today, this preposterous spectacle, Your Honor, I

23   believe is a compelling reason why severance should be

24   granted for my client and I'll let others address why they

25   too should be severed.  But in short, Your Honor, my client

1    allegedly participated in one discrete transaction in which

2    it is alleged in two overt acts out of hundreds that he

3    agreed to the exchange of pseudoephedrine which is perfectly

4    legal for one to possess yet it is illegal to possess or

5    transact if one is doing so for the purposes of manufacturing

6    some controlled substance.

7          Notwithstanding the fact that my client allegedly

8    transacted one time, one particular shipment involving a very

9    small number of cases of this otherwise perfectly legitimate

10   chemical substance, he now stands charged with 37 defendants

11   in this wild environment where he can't have the benefit of

12   appearing before this Court in a personalized, humane

13   fashion.  He is one of dozens in a case now where the timing

14   and the pace of the litigation is totally outside his control

15   with the amount of discovery is overwhelming to the point of

16   crushing him.

17         Your Honor, in order for this case to be litigated

18   fairly and appropriately on behalf of my individual

19   defendant, it is absolutely essentially that he have a chance

20   to face the jury or a trier of fact because perhaps we'd even

21   waive a jury if he had an opportunity to be tried before an

22   individual trier of fact as an individual based on what he

23   allegedly did as an individual one time with this one

24   discrete amount of chemicals.  Unless he has an opportunity,

25   Your Honor, to be seen and heard as an individual and not to

1    be lost in a sea of faces and to be dehumanized and

2    impersonalized in this type of litigation environment, he

3    will be swept away, Your Honor.

4            And he will remain in custody for over -- by the

5    time this case goes to trial in April of next year, he will

6    have been in custody for 16 months and that's because of

7    forces completely outside his control because the government

8    chose to include him in this massive case.  So Your Honor, a

9    severance is critical to us so that I can have an opportunity

10   to effectively represent my client in a forum in which his

11   defense will be heard and understood, in which the evidence

12   against him can be parsed out from that of dozens of other

13   defendants, and in which he can establish that the government

14   cannot meet the elements of proof in connection with this

15   case.

16           Now, Your Honor, the first motion that I brought in

17   my omnibus motion is actually for dismissal of the

18   indictment.  I'll turn to that now.  In this indictment,

19   Your Honor, because the government chose this format where

20   they indicted 37 people in this wide-ranging 60 page massive

21   indictment, nowhere does this indictment allege in

22   particular, Your Honor, that my client engaged in any

23   transaction with any otherwise perfectly legal chemical

24   substance with a knowledge and intent that that chemical

25   substance should be used to manufacture controlled substance.

The knowledge and intent to use this otherwise legal

substance pseudoephedrine to manufacture a controlled

substance is an absolute element of this offense.

In the absence of a charge in the indictment that a

jury or a trier of fact can perceive and make distinct

against my client and personalize as to my client, then this

indictment is faulty as against him, and this conspiracy

indictment must be dismissed as against him because this

indictment does not state that my client at the time that he

allegedly transacted in this small quantity of otherwise

legal substance that he knew then and there that it was an

illegal act that he was committing and that he knew then and

there that his intent was to use the pseudoephedrine for the

purpose of manufacturing methamphetamine.

So I submit, Your Honor, that this case should be

dismissed indictment for conspiracy against my client should

be dismissed on the basis that the material element of

knowledge and intent in connection with this discrete

transaction is not alleged against him and therefore the case

should be dismissed against him on that basis.

Your Honor, I have addressed the issue of severance

and now I will turn to the issue of venue, which is

inextricably bound to the issue of severance because my

client has been taken from his home in the Chicago area where

the alleged illegal acts that he performed occur, where the

1   witnesses for his defense reside, where all the percipient

2   witnesses to what he allegedly did reside, and he is being

3   forced to litigate in a distant forum for which naturally he

4   is denied bail because after all, he's not from this district

5   and it absolutely prejudices him beyond repair.

6          The government has placed my client in a no win

7   situation.  They've alleged against him acts that occurred in

8   a very discrete, truncated, particularized fashion in

9   Chicago.  They have taken him and put him in a case in the

10   Central District of California where he is then prejudiced

11   because he's denied bail because he's from out of the

12   District.  He is incarcerated for 16 months because he is

13   denied bail.  He is swept along in this massive indictment

14   towards a trial date in the distance future that he would

15   rather not have to face.  He would rather litigate the case

16   promptly and effectively early on, and he is prejudiced in

17   this fashion all because his case is stuck in the Central

18   District of California with this multitude of other

19   defendants.

20          Mr. Isa, Your Honor, should be severed from this

21   case and/or venue should be shifted to the Northern District

22   of Illinois where he will have an opportunity to face a jury

23   of his peers in the middle west, where he will have an

24   opportunity to litigate his acts in the forum in which they

25   occurred, where he will have access to percipient witness to

1    the physical acts involved in this alleged criminal offense,

2    where he will have access to the friends and family to

3    provide him moral, emotional and perhaps evidentiary support

4    in the form of character evidence.  If the Court does not

5    grant the change of venue, he is irreparably prejudiced

6    because he is a stranger here in a strange jurisdiction

7    litigating acts that occurred far, far away, deprived of his

8    witnesses and his family and the resources necessary for him

9    to mount an effective defense here in the Central District of

10   California for these acts which were witnessed and occurred

11   back in the state of Illinois.

12          The last part of my motion, Your Honor, which I

13   believe that this Court should give serious attention to and

14   should grant is my request that the grand jury transcripts be

15   forthwith disclosed to all parties in this case.  This is an

16   extraordinary case, Your Honor.  I know without even knowing

17   Your Honor that this has got to be the first or second time

18   the Court has faced this type of unwieldy, inappropriately

19   large, overdone type of indictment with all these defendants.

20   Your Honor knows from the experience that we had litigating a

21   prior defendant named Omar Khalil whom I had the pleasure of

22   representing prior to representing Adnan Isa that the

23   government in the case of Omar Khalil had mistaken his

24   identity.  They indicted him and then when we came here at

25   the bail hearing, Your Honor, or thereabouts discovered they

1    had the wrong guy.  And so the government on its motion

2    dismissed the case against him.

3            Now, Your Honor, I ask the Court the government

4    knows after indicting all these people that it made a mistake

5    with regard to Omar Khalil, yet he was indicted by a grand

6    jury that was probably told he was guilty of some offense.

7    What else was the grand jury told, Your Honor?  What other

8    misinformation was the grand jury given that led them to

9    indict other defendants who have not yet been dismissed

10   because the government will not yet acknowledge that it is

11   wrong, that it has mistaken their identities for others.  I

12   know in the case of Adnan Isa in particular, Your Honor, I

13   have been before this Court and this Court has shown great

14   patience.

15           I have been before this Court at two bail hearings

16   where I have demonstrated for the Court that there are at

17   least two and probably three other Adnans on these tapes.

18   Adnan is a common Arab name.  It's a name found in the Koran.

19   There are other Adnans who are allegedly involved in the

20   offenses that are part of this indictment.  In fact, the

21   tapes reveal that there's an Adnan who came to court with one

22   of the codefendants in a state court matter in Long Beach.

23   He's on the tapes.  He's conferring with one of the attorneys

24   in this case.  It's all in evidence and he's Adnan.  I

25   suspect, Your Honor, that the grand jury was told that my

 1    Adnan is that Adnan because there's no other Adnan in this

 2    case.

 3            I believe, Your Honor, for me to able to determine

 4    before trial not on appeal 3 years from now when my client's

 5    already been in custody for most of his adult life, but now,

 6    Your Honor, I should have an opportunity to review those

 7    grand jury transcripts to find out what the grand jury was

 8    told about Omar Khalil that caused them to indict a man that

 9    the government later acknowledged was a mistake.  I should

10    have the opportunity to see how many other Adnans were

11    described as my Adnan, how many acts were attributed to my

12    client that were performed by other Adnans.

13            And maybe, Your Honor, there was a tremendous

14    amount of confusion in the presentation to the grand jury.

15    And if the grand jury was wrong, Your Honor, and they did not

16    have probable cause to indict my Adnan for the acts of other

17    Adnans, I should think that would be a matter of grave

18    concern of this Court and the Court should want to get to the

19    bottom of that.

20            THE COURT:  You've got two more minutes.

21            MR. WERKSMAN:  Yes, Your Honor.  I'm right on

22    track.  I suspect, Your Honor, the government is going to

23    oppose this.  They want to maintain the secrecy of their

24    grand jury transcripts and they're going to maintain --

25            THE COURT:  They usually do.

1          MR. WERKSMAN:  And they're going to maintain their

2     steadfast self-confidence that they've got the right Adnan,

3     but we know they've been wrong before, Your Honor.  They've

4     come before this Court and said we indicted the wrong man and

5     yet those transcripts are still sealed.  What was that grand

6     jury told?  I also submit, Your Honor, I'm not making an

7     accusation that Mr. Stern or any of the agents working on his

8     behalf may have done this on purpose.  It's confusing, Judge.

9     It's difficult to understand the different relationships

10    between so many defendants.  I suspect that the presentation

11    to the grand jury was confused and muddled and may have been

12    susceptible to misidentification.  We know it happened with

13    Omar Khalil.

14          In light of the fact that there's other Adnans

15    running around, doing things in connection with this case,

16    and my client's the only Adnan charged that this grand jury

17    was told things about my client that he didn't do that other

18    Adnans did.  And on that basis, Your Honor, I think I have

19    raised enough of a case where this Court should be suspicious

20    of what was told to this grand jury and should order that

21    these transcripts be revealed so that I can find out what the

22    grand jury was told in order to garner an indictment against

23    my client who otherwise did one little thing once involving

24    one little of quantity of an otherwise legal substance and

25    yet now finds himself as a defendant in this case being

1    accused I think of things that another Adnan may have done,

2    but I won't know that, Judge unless I see those grand jury

3    transcripts.  So I'll submit that would be a very appropriate

4    basis for this Court to grand my motion.

5    THE COURT:  All right.  Thank you.  Mr. Stern, if

6    you have something to argue outside your papers, go ahead.  I

7    know that on the last point you're going to tell me that all

8    we have is speculation and on -- and in addition to that, we

9    have been through what's on the tapes previously and why you

10   think there is probable cause to believe that this the right

11   defendant.

12   MR. STERN:  And in fact I indicated to the Court

13   and to defense counsel that prior to the last detention

14   hearing we actually had the coconspirator cooperators listen

15   to some of the tapes to ensure that there was no other Adnan.

16   And it's not as though we earlier presented some indication

17   at an earlier hearing that then there was some other Adnan

18   that we then corrected ourselves with, but all along we have

19   know that this particular Adnan we attribute the evidence to

20   is Adnan Isa.  That's not only been corroborated by the

21   investigation of the agents, but actually by coconspirators

22   who are participants in the crime who have listened to and

23   identified the defendant's voice and said it's Adnan Isa.

24   THE COURT:  I understand.  So you've made that

25   point.  I think I know your position on the severance and on

1    change of venue and I'm just going to have to take that under

2    submission and make a ruling.

3            MR. STERN:  And with respect to severance, let me

4    say this.  That defense counsel seems to be operating under

5    the supposition that the entirety of the government's case is

6    going to be connected to the two overt acts that are

7    mentioned in the indictment, but that isn't the case.  The

8    ways and means of the conspiracy on page 5 of the indictment

9    paragraph 4 specifically discusses the type of role that the

10   defendant was participating in in the conspiracy.  And the

11   role that the defendant had was greater than the specific

12   overt acts that we may have listed.  It specifically

13   indicates that the defendant was involved transporting

14   pseudoephedrine from Chicago to California for distribution

15   of his -- to his California customers.

16           THE COURT:  I understand.

17           MR. STERN:  And why I'm telling the Court is that

18   it is inappropriate for defense counsel to think that the

19   entirety of the evidence that's going to be presented is

20   evidence relating to those two overt acts.  Rather, I can

21   tell the Court that I anticipate there's going to be a

22   substantial amount of evidence that will flesh out and

23   describe the defendant's larger role both testimony from the

24   coconspirators who will talk about the defendant's repeated

25   activities in relation to trafficking pseudoephedrine as well

1   as wire tap tapes that will also flesh out and show the

2   defendant's substantial involvement in the trafficking not

3   exclusively in these two situations, but in other scenarios

4   with his brother.  So to say that we should count up the

5   number of overt acts of the defendant and if it falls below

6   some particular number, the defendant should somehow be

7   severed is simply wrong.

8           THE COURT:  Contrary to law, too.

9           MR. STERN:  Exactly.  There's a very heavy burden

10  under the 9th Circuit law that a defendant has in order to

11  establish that severance is appropriate, and the 9th Circuit

12  sets out certain reasons that that should take place.  If

13  there's some inability to cross-examine witnesses for some

14  reason, if there's a conflict in counsel, and a variety of

15  other things I have set forth in my papers.  None of those

16  are present here.

17          THE COURT:  I understand and if there are mutually

18  exclusive defenses and things like that.  So far that is not

19  in the record.  That is why I have indicated that at this

20  point in time I'm not prepared to grant a severance.  I don't

21  think we need to reargue that.

22          MR. STERN:  Okay.  With respect to defense

23  counsel's request that the indictment be dismissed, to the

24  extent that the defendant is arguing that the indictment

25  should set forth the material elements of the crime, the

 1    government agrees with defense counsel.  We're not contesting

 2    that rule of law.  But defense counsel seems to be of the

 3    impression that every time we list an overt act, we have to

 4    repeat in the indictment that it's done with knowledge that

 5    the pseudoephedrine was going to be used to make

 6    methamphetamine.  That is not the law.  And it's such a novel

 7    proposition that defense counsel has not cited any support

 8    for it.

 9              THE COURT:  I know that.

10              MR. STERN:  In fact, rather we cite the Shavalya

11    case which indicates that the government doesn't even have to

12    prove an overt act at all.  But to the extent that the Court

13    is trying to determine whether or not we have alleged

14    knowledge and intent, that is clearly alleged in the larger

15    portion of the conspiracy.  Specifically, at the indictment

16    at page 4 Count 1 charges this defendant with quote, unquote

17    knowingly and intentionally conspiring with others to

18    distribute pseudoephedrine to aid and abet the manufacture of

19    methamphetamine.  In addition, also on page 4, there is an

20    indication yet again that the agreement to aid and abet the

21    manufacture of a controlled substance was done quote,

22    "knowingly and intentionally."  So to the extent the defense

23    counsel is saying we have neglected to put the language in

24    there and in essence put that element in there he's simply

25    wrong.

```
 1          Finally, with respect to his argument about venue,
 2     defense counsel's indication that the defendant may enjoy
 3     additional moral and personal support in Chicago where the
 4     crux of his family is simply doesn't rise to the legal
 5     demands that are required in order to satisfy a change of
 6     venue.
 7          THE COURT:  You cite that case in your papers.
 8          MR. STERN:  Exactly.  In that case the Court
 9     clearly said that if any of the overt acts are done by any
10     coconspirators, it is appropriate to bring the charge in that
11     district.  It isn't even plausible for defense counsel to
12     argue otherwise and for that reason we say venue is proper
13     here.  I'll submit on the papers.
14          THE COURT:  Thank you very much.  All right.  The
15     matter will stand submitted.  Now moving on, do we now move
16     on to Christian Boyd?
17          MR. STERN:  Yes.
18          THE COURT:  Okay.  Why don't we then take a
19     5-minute recess to permit those counsel who wish to leave to
20     do that and then we'll take up Mr. Boyd's matter.
21          MR. STERN:  Your Honor, the only other thing I
22     should mention is defense counsel for Nabhan Isa asked that
23     the issue of severance also be argued now because of its
24     similarity.  I'm sorry.  Motion to dismiss because of the
25     similarity to defense counsel for Adnan Isa.  We have no
```

1    objection.

2            MR. CURIEL:  Your Honor, I wasn't clear as to

3    Nabhan Isa's motion for dismissal whether or not that was

4    going to be next Friday or whether the Court wanted to do

5    that on the same day that we're doing the motions for Mufid

6    Isa on the motion to suppress statement evidence.

7            THE COURT:  I'm happy to deal with it today if

8    that's your --

9            MR. CURIEL:  That's fine with the government.

10           THE COURT:  But let's start at the beginning.  The

11   Nabhan Isa motion to dismiss.

12           MR. KESSEL:  Your Honor, if we may, if we could

13   put that matter over to the August 30th the same time as the

14   suppression.

15           THE COURT:  That's agreeable.  Let's hear it on

16   August 30th.  Then should we take a 5-minute recess to permit

17   those who wish to leave to do so?

18           MR. STERN:  Certainly.  It's my understanding none

19   of the other attorneys need to stay except for the attorney

20   for Christian Boyd.

21           THE COURT:  No one must, but anyone who would like

22   to stay is welcome to.

23           MR. STERN:  Thank you.

24           MR. KATZ:  We still have Khalil Mohammed.

25           THE COURT:  I know.  We can take that up, too.

1  Let's get the testimony in and then --

2              MR. BACKMAN:  Is the Court going to excuse the

3  defendants as well and have them returned?

4              THE COURT:  If that's your desire, yes.  Where

5  counsel have asked that their clients be excused and

6  returned, please I'd appreciate the marshals returning them

7  so they can go back to MDC and not sit here any longer.

8              MR. TREMAN:  In terms of excusing defendants,

9  Your Honor, do you want us just to advise Your Honor's clerk?

10             THE COURT:  Yes.  Thank you.

11             (Recess taken.)

12             THE CLERK:  We're back in session.

13             THE COURT:  Before we move to the Christian Boyd

14  motion, let me just ask the government this.  With regard to

15  Mr. Katz and Khalil Mohammed, are there any separate issues

16  regarding which Mr. Mohammed would have to be advised that

17  haven't been covered in the case down in Riverside?  In other

18  words, I know that Judge Phillips appointed counsel to advise

19  Mr. Mohammed and then entered her order.  And my question is

20  do we have in your view different issues in this case than we

21  had in hers?

22             MR. STERN:  It's my understanding that Judge

23  Phillips appointed counsel to advise Islam Salamay.

24             THE COURT:  I'm sorry.  I said it exactly

25  backwards.

UNITED STATES DISTRICT COURT

```
 1              MR. STERN:  The only issue that would be relevant
 2      and I think it is particularly relevant is that defense
 3      counsel also at least for a period of time represented
 4      Abdallah Ayeh.
 5              THE COURT:  I know that.
 6              MR. STERN:  And that's the brother of Khalil
 7      Mohammed.  They would obviously have had a great incentive to
 8      cooperate against one another.  Defense counsel represented
 9      both of them.  Now, I do know that at the arraignment,
10      someone else came in and represented --
11              THE COURT:  Is that Mr. Potter?
12              MR. POTTER:  I'm right here.  I was appointed
13      today to represent Mr. Ayeh, and that's why I stayed to
14      listen to this, but my knowledge of this case is maybe
15      3 hours old.
16              THE COURT:  Well, your client may have an
17      objection.  I have no idea.
18              MR. POTTER:  My client has asked me to work
19      closely with Mr. Katz.  My client has a great deal of faith
20      in Mr. Katz and so he's expressed to me no feeling of
21      discomfort with Mr. Katz or with the fact that Mr. Katz
22      represents his brother.  And I do -- I state that because
23      that's what I have been told.
24              MR. KATZ:  May I be heard briefly, Your Honor?
25              THE COURT:  Sure.
```

1          MR. KATZ:  If the Court wanted, Mr. Ayeh was just

2    taken back about two minutes ago and I think we could have

3    him returned if the Court wanted to take any waiver from him.

4    But we appeared before Magistrate Judge Walsh who had great

5    familiarity with the case.  I believe he had signed some of

6    the wire tap orders in the case or he had a great deal of

7    prior familiarity with the case.  He made the recognition and

8    I think it's fairly obvious, but I also thought it was

9    insightful, that there's no conflict of interest between the

10   two brothers on whether Abdallah Ayeh ought to get out on

11   bail or not.  Obviously they would both be very desirous no

12   matter what else may happen in the case that Mr. Ayeh get out

13   on bail.

14          They are also two brothers who are very close so

15   it's not the kind of situation where there's any discord or

16   disharmony.  And so the government made all of these

17   arguments about why I shouldn't be allowed to represent

18   Mr. Ayeh at his bail hearing.  The Court should be aware that

19   the bail hearing was set the very day after Mr. Ayeh's arrest

20   and Magistrate Judge Walsh said that I could appear and took

21   a waiver from Mr. Ayeh for that purpose.

22          By the way, he did set bail and Mr. Ayeh is

23   endeavoring to make that bail, Your Honor.  Turning to

24   Mr. Salamay, AUSA Stern appeared out in Riverside.  He made

25   these arguments to Judge Phillips.  Indeed, he made some of

 1   the most convoluted arguments I have ever heard for why there

 2   was a possible potential --

 3            THE COURT:  Let's not engage in character

 4   assassination either way.  I'm only trying to decide whether

 5   we can proceed on this matter today or whether it's best to

 6   do it later in the week.

 7            MR. KATZ:  Your Honor, I think we can proceed

 8   today.  I think it was a true over abundance of caution by

 9   Judge Phillips and frankly, I don't think that it

10   accomplished a great deal because Mr. Salamay was fully

11   advised.  Mr. Khalil Mohammed has been fully advised.  One of

12   the problems there was that Mr. Salamay is not fluent in

13   English like Mr. Khalil Mohammed is.  And so there was a

14   question in front of Judge Phillips as to how good was his

15   English at the time that he read and signed the waiver of

16   conflict of interest.

17            And so we had a meeting with the appointed attorney

18   and with the Arabic interpreter who is actually here in court

19   with us today.  And they met separately, the Arabic

20   interpreter, the appointed counsel, and Mr. Salamay.

21   Your Honor there is not even a similar concern with Khalil

22   Mohammed.  He's fluent in English.  He knows exactly what the

23   situation is.  If there's any question of him making a

24   waiver, he would make the waiver.

25            And I would say this, Your Honor.  I'm not trying

UNITED STATES DISTRICT COURT

```
 1    to be pejorative.  The supposed conflict is a very attenuated
 2    one.  And it's not that Mr. Salamay could give information
 3    against Mr. Khalil Mohammed or vice versa.  The argument goes
 4    something like this.  Mr. Salamay could decide to give
 5    information against his own brother, Mr. Shoukhah.
 6    Mr. Shoukhah could then decide he's in desperate straights
 7    and that he would then want to give information Mr. Khalil
 8    Mohammed, Your Honor we don't even get to the predicate.
 9            We don't even get to the premise because Mr. Islam
10    Salamay made it absolutely clear on the record that no matter
11    who was representing him, he does not want to be the engine
12    of his brother's Shoukhah's criminal destruction.  And he
13    does not want to cooperate in any way, shape or form at this
14    point against Mr. Shoukhah no matter who was representing
15    him.
16            Now, turning the other way around, Your Honor, the
17    idea that Khalil Mohammed could somehow have a conflict of
18    interest, he's the number 1 defendant in this 40 defendant
19    case, that he somehow wants to go or has information against
20    a gentleman who is charged in a completely different case, a
21    very lower role sort of person, case in a different division
22    pending out in Riverside is just far-fetched, but,
23    Your Honor, we will waive even that possible potential
24    conflict.
25            I think we can do it right now.  He's also signed a
```

1    written waiver which is part of the record.  And I just don't

2    think we need to take all the hours and hours that we took in

3    Salamay.  I don't think it really -- I just think it was an

4    over abundance of caution, but I just think it was a real

5    over abundance.

6              THE COURT:  Okay.  Let me hear from you,

7    Mr. Stern.

8              MR. STERN:  Your Honor, I'm just going to recap my

9    concerns, and then obviously let the Court make its own

10   decision.  My concerns in this case which are slightly

11   different than the Riverside case is that defense counsel had

12   represented Abdallah Ayeh for a period of time in which the

13   detention hearing was heard and in which there was a

14   substantial amount of contact between the two of them.

15   Abdallah Ayeh is now charged in the same indictment with

16   defense counsel's other client Khalil Mohammed.

17             The nature of the relationship between the two of

18   them creates a serious problem.  And that is the indictment

19   alleges, and I think the evidence at trial will prove, that

20   Abdallah Ayeh worked directly for Khalil Mohammed.  So it's

21   not as though they're attenuated, but rather I think the

22   evidence will show they worked jointly and Khalil Mohammed

23   would utilize Abdallah Ayeh who would perform a variety of

24   different functions for Khalil Mohammed in order to help

25   Khalil Mohammed in the conspiracy.

```
1              So to the extent that each of them knows in great

2     detail the business of the other, there's a problem.  Because

3     if Abdallah Ayeh wanted to cooperate against the person that

4     he would have the most evidence and would be able to help the

5     government most completely against that would be his

6     attorney's other client or his former attorney's other

7     client.

8              THE COURT:  That's where I get lost.  No one is

9     cooperating now as I understand it.

10             MR. STERN:  These two are not cooperating.

11             THE COURT:  These two are not cooperating.  So now

12    we have Mr. Mohammed saying he wants Mr. Katz to represent

13    him.  Now, the problem is I think I do have to secure a

14    waiver from Mr. Potter's client, but I don't understand if

15    Mr. Katz has not been subject or part of any earlier efforts

16    to cooperate, I don't know how his representing Mr. Mohammed

17    somehow creates a conflict.  No other circumstances and I can

18    of other times when I have seen potential conflicts, but this

19    one doesn't seem to be the conflict you're concerned about

20    unless I'm missing something.

21             MR. STERN:  May I explain?

22             THE COURT:  Yes.

23             MR. STERN:  Because they clearly know each other

24    Khalil Mohammed and Abdallah Ayeh, they're the persons

25    against whom they could clearly cooperate.  Let's say now
```

1    Abdallah Ayeh decides that he wants to cooperate through the

2    representation of Mr. Potter and he comes to the government

3    and makes a proffer.  He would clearly, based on what we

4    know, be able to provide information about Khalil Mohammed.

5    If we worked out a deal, he would end up having to testify

6    against Khalil Mohammed.  That may very well be in his best

7    interest and get him the best deal.  David Katz, the attorney

8    who represented both him and Khalil Mohammed, would then be

9    in a position of having to cross-examine and discredit a

10   former client of his in order to assist a current client of

11   his.

12            THE COURT:  I understand all of that.  That's why

13   I think we probably need a very express waiver on the record,

14   but I don't think -- there is a potential for conflict no

15   doubt about that as you describe, but we're not there yet.

16   We're probably never going to get there and maybe we will get

17   there.  I just don't know.

18            MR. STERN:  Let me then express to the Court

19   something that's come up that I think actually exhibits and

20   characterizes the true actuality of the conflict.  Defense

21   counsel initially did not represent Islam Salamay, the

22   defendant in the other case.  That defendant we believe has a

23   connection to his current client Khalil Mohammed by way of

24   the brother Khala Chouka, and I think that our evidence will

25   show that pseudoephedrine went from Khalil Mohammed to Khala

1   Chouka to Chouka's brother Islam Salamay in pretty much a

2   direct line.

3           What happened was when Islam Salamay had a

4   different attorney, the attorney came in, spoke with the

5   government AUSA and signed, actually signed a cooperation

6   agreement and gave a debriefing in which he talked about the

7   illegal activity of Khala Chouka, his brother.  Defense

8   counsel Mr. Katz then came in and began representing Islam

9   Salamay and shortly thereafter Islam Salamay --

10          THE COURT:  On the night before you expected to

11  file the plea agreement decided not to cooperate.

12          MR. STERN:  Yes.  But the point is that the things

13  that he had said before about Khala Chouka, that Khala Chouka

14  had actually also said himself, he now under the

15  representation of defense counsel recanted all of that

16  material and is in a situation where he can't be used as a

17  cooperating witness because he's made this type of

18  recantation.  And it is plausible to understand that if there

19  is an interest that defense counsel would have in ensuring

20  that a set of dominos not fall on his client that is most

21  vividly expressed by virtue of the fact that you've now got

22  someone who had signed a plea agreement, was going to plead

23  guilty, and all of sudden recants when the defense attorney

24  comes in.

25          THE COURT:  But that's not the case as to the two

1  defendants in my case.  You're talking about something in

2  Riverside.

3          MR. STERN:  What I'm saying is that it goes both

4  ways.  In the same way that Islam Salamay could tip the

5  dominos that would ultimately hit Khalil Mohammed, Khalil

6  Mohammed can also go the same way and tip the domino that

7  would hit Islam Salamay.  So it is a different defendant, but

8  it's the same lineal progression from one client of Mr. Katz

9  to the other.

10          THE COURT:  This is way beyond me.  I really think

11  that based on what I see today there is a potential for a

12  conflict.  We're going to have secure the appropriate

13  waivers, but I don't think there is a basis for saying that

14  Mr. Mohammed can't be represented by his counsel of choice.

15          MR. STERN:  Then I'm going to stop my argument and

16  let the Court secure the waivers that it deems appropriate.

17          THE COURT:  But aren't we missing who we need?

18  Didn't the codefendant, Mr. Potter's client go back

19  downstairs?  Could you bring him back up.  Let's see if we

20  can get this done.

21          THE CLERK:  What's the defendant's name?

22          THE COURT:  Ayeh.

23          MR. KATZ:  Your Honor, in view of the fact that

24  we're so many less at this time, could my client come up to

25  the lectern with me?

```
 1            THE COURT:  If it's agreeable with the marshals,

 2     sure.

 3            MR. KATZ:  While we're waiting for Mr. Ayeh, I did

 4     want to mention one thing as well because the Court might

 5     want to include in its waiver.  At the time of the arrest of

 6     Mr. Khalil Mohammed, a search was done of Mr. Abdallah Ayeh,

 7     his brother.  In searching Mr. Abdallah Ayeh's house some

 8     cash was taken.  There was also records about some bank

 9     accounts so the agents went to the bank accounts and they

10     seized, there must have been about $180,000 in the bank

11     accounts.  They also seized two cars from the brother.

12            The reason I bring that up is that there is a

13     pending forfeiture and indeed with began that forfeiture back

14     in February or March making the claims and now the matter is

15     pending before Judge Anderson.  At that time Mr. Abdallah

16     Ayeh was not charged with anything.  Only his brother Khalil

17     Mohammed was charged and Khalil was in jail.  But I did want

18     the Court to be aware that I am representing Mr. Abdallah

19     Ayeh the brother in front of Judge Anderson in trying to get

20     that property returned.

21            But Mr. Khalil Mohammed is not claiming any of that

22     property.  He is claiming $4,000 that was seized from him

23     when he was arrested in Las Vegas.  Only the brother and as

24     to some property the brother's wife is claiming that

25     property.  So I certainly don't see any conflict there at all
```

1    since neither one is claiming the same property, but I want

2    the Court to be aware that I obtained at that time signed

3    waivers from both Mr. Ayeh and from Mr. Khalil Mohammed.

4    Then later when the government raised the Salamay matter, I

5    obtained a signed waiver from Mr. Salamay and Mr. Mohammed

6    which are Exhibits A and B to my response.

7         THE COURT:  All right.  Thank you.  Why don't you

8    Mr. Potter step down with your client.  May we proceed?  All

9    right.  Mr. Ayeh, it's my understanding that you were

10   previously represented by Mr. David Katz; is that correct?

11        THE DEFENDANT:  Yes, ma'am.

12        THE COURT:  And it's also my understanding that he

13   represents you in a forfeiture proceeding arising out of this

14   case which is before Judge Anderson?

15        THE DEFENDANT:  Yes, ma'am.

16        THE COURT:  And do you understand that in the

17   course of those two representations you have provided

18   information to Mr. Katz who now represents your brother

19   Mr. Mohammed?

20        THE DEFENDANT:  Yes, ma'am.

21        THE COURT:  Now, do you understand that in the

22   event at some subsequent point in this case you were to have

23   further conversations with the government, attempt to enter

24   into a plea agreement or provide any cooperating information

25   Mr. Katz might have and his client might an interest adverse

1    to yours?  I realize Mr. Mohammed is your brother, but he

2    could conceivably have an interest adverse to yours and

3    Mr. Katz who used to represent you would now be the attorney

4    for your brother Mr. Mohammed and be totally loyal to him.

5    Do you understand that could come up?

6                THE DEFENDANT:  Yes, ma'am.

7                THE COURT:  Now, do you understand that in that

8    circumstance Mr. Katz might be placed in the position of

9    having to cross-examine you and he might end up using

10   information that he learned in the course of representing you

11   in this proceeding and in the proceeding before Judge

12   Anderson?

13               THE DEFENDANT:  Yes, ma'am.

14               THE COURT:  And my question now to you is knowing

15   all of that, do you have any objection to Mr. Katz who used

16   to represent you and still represents you in the forfeiture

17   proceeding, do you have any objection to his representing

18   your brother?

19               THE DEFENDANT:  No, ma'am.

20               THE COURT:  You understand that in the course of

21   representing your brother, Mr. Katz in the course of

22   representing your brother if he lives up to his

23   responsibilities to your brother could conceivably be in a

24   position where he would potentially breach the

25   attorney/client privilege he holds with you if he were to

UNITED STATES DISTRICT COURT

1    either deliberately or inadvertently take information he

2    learned from you and used it to disrupt your negotiations

3    with the government.  And that was pretty convoluted.

4            MR. POTTER:  May I have a second, Your Honor?

5            THE COURT:  And the same is true if this case

6    proceeded to trial, let's assume you and your brother both go

7    to trial in this case and for some reason you decide to take

8    the witness stand, you understand that Mr. Katz is in a

9    position because he used to represent you to know things that

10   he could use to cross-examine you with and that would work

11   adversely to your defense in this case?

12           THE DEFENDANT:  Yes, ma'am.

13           THE COURT:  And that's still okay with you?

14           THE DEFENDANT:  Yes, ma'am.

15           THE COURT:  Okay.  Mr. Stern or anyone else

16   anything else you want me to ask?

17           MR. STERN:  No, Your Honor.  The only -- well, the

18   only other thing I would indicate I'd like the Court to ask

19   is that there may be other types of conflicts that the Court

20   hasn't expressly indicated that may arise.  And the

21   defendant's waiver is complete even though the Court may not

22   have specifically talked about these individual things.

23           THE COURT:  Do you understand that?  As we sit

24   here, Mr. Ayeh, we can only speculate as to what the

25   potential conflicts might be that arise because Mr. Katz used

1   to represent you and now represents your brother.  Do you

2   understand that I may not -- that I have not listed every

3   conceivable conflict and there could be many others that

4   arise that we haven't thought about?

5           THE DEFENDANT:  I understand.

6           THE COURT:  And even though we haven't told you

7   about all the conceivable conflicts that could arise is it

8   your intention to give up your right to challenge any other

9   conflicts?  In other words, are you agreeing that Mr. Katz

10  may represent your brother no matter what conflicts my arise

11  between you and your brother in course of this proceeding?

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  Okay.  Anything else, Mr. Stern?

14          MR. STERN:  No.  Just for the record, defense

15  counsel we heard indicated that the first loyalty, the

16  defendant understands the first loyalty will be to Khalil

17  Mohammed and that there may have been things that he learned,

18  that Mr. Katz learned while representing the defendant that

19  may work to his disadvantage, but it's my understanding he's

20  willing to waive all of that.

21          THE COURT:  That's my understanding.  Is that

22  correct, Mr. Ayeh?  You're willing to give up all those

23  rights?

24          THE DEFENDANT:  Yes, ma'am.

25          MR. STERN:  Nothing further.  Thank you.

```
 1              THE COURT:  Then the Court is going to --
 2              MR. POTTER:  May I say one thing?  In waiving that
 3    conflict, he's not waiving the attorney/client privilege with
 4    Mr. Katz so as far as third parties are concerned.
 5              THE COURT:  Absolutely correct.  He's not doing
 6    that.  My concern, Mr. Ayeh, I don't know that any of us is
 7    being as clear as we want to be at this hour of the day, but
 8    what we are saying is you disclosed things about your case to
 9    Mr. Katz.  And as much as we expect Mr. Katz to keep private
10    the conversations that he had with you, he is now going to
11    represent your brother.  And in representing your brother he
12    could inadvertently or even deliberately take information
13    that you conveyed to him in confidence and now use it against
14    you.
15              And the concern here is that while we don't expect
16    him to do that, if that were to happen because of something
17    else that happens in the case, you're telling us you still
18    have no problem with Mr. Katz representing your brother
19    Mr. Mohammed?
20              THE DEFENDANT:  No, ma'am.
21              MR. POTTER:  That's correct.
22              THE COURT:  All right.  Thank you.  Then I think
23    the Court finds that there has been an adequate waiver of
24    conflicts both known and unknown and will determine that
25    Mr. Katz may represent Mr. Mohammed in these proceedings.
```

1    MR. KATZ:  Your Honor, thank you very much for the

2    time that you have taken.  May my client and I be excused?  I

3    believe the next matter --

4    THE COURT:  As soon as Mr. Stern has a chance to

5    say something.

6    MR. STERN:  I think that the Court should go

7    through the same process, the same colloquy with

8    Mr. Mohammed.

9    THE COURT:  I think that's right.  Mr. Mohammed,

10   you understand that Mr. Katz used to represent your brother

11   Mr. Ayeh?

12   THE DEFENDANT:  Yes, ma'am.

13   THE COURT:  And now he represents you?

14   THE DEFENDANT:  Yes, ma'am.

15   THE COURT:  When he represented your brother, he

16   promised to your brother that he would keep everything your

17   brother disclosed to him in confidence and not disclose that

18   to any other person.

19   THE DEFENDANT:  I understand, yes, ma'am.

20   THE COURT:  And do you also understand -- who has

21   the cell phone and get it out of this room.  Now, what I was

22   going to ask you, Mr. Mohammed is this.  Mr. Katz is now your

23   attorney and he owes his primary obligation of loyalty to

24   you.  Do you understand that?

25   THE DEFENDANT:  Yes, ma'am.

UNITED STATES DISTRICT COURT

1            THE COURT:  But nonetheless because he used to

2    represent your bother and owed a similar duty of loyalty to

3    him, there may come a time when he will have information that

4    could be used to your advantage which he will not be able to

5    share with you or use to your advantage because he learned it

6    in the course of his representing your brother.  Do you

7    understand that?

8            THE DEFENDANT:  I understand.

9            THE COURT:  And so for that reason there is

10   conceivably a possibility that Mr. Katz could not serve you

11   as well as independent counsel who did not previously

12   represent your brother, who did not have constraints that he

13   has because he also has a duty of loyalty to your brother.

14           THE DEFENDANT:  I understand.

15           THE COURT:  Okay.  And does the fact that Mr. Katz

16   potentially might not be able to represent you as fully and

17   vigorously as an independent lawyer, does that fact cause you

18   to have any concern about his ability to represent you?

19           THE DEFENDANT:  I understand.

20           THE COURT:  Do you understand that he could have a

21   conflict of interest because he used to represent your

22   brother?

23           THE DEFENDANT:  Yes, I understand.

24           THE COURT:  And you don't care?

25           THE DEFENDANT:  I don't care.

```
 1              THE COURT:  Okay.  Mr. Stern, do we have anything
 2     else we need?
 3              MR. STERN:  Yes.  Ask that the Court indicate to
 4     the defendant that this may be expressed in either potential
 5     plea negotiation that may require cooperation or may be
 6     expressed in a variety of other ways we can't think of and
 7     ask then defendant to waive the potential problems that may
 8     arise.
 9              THE COURT:  I asked your brother these questions.
10     There could conceivably be a time where you became involved
11     in discussions with the government and I'm not quite sure how
12     it's going to come up in this case, I can see how it would
13     come up in the other case.  Assuming you wish to cooperate
14     with the government or enter into a plea agreement with the
15     government, do you understand that Mr. Katz because he used
16     to represent your brother may not be able to represent you
17     quite as forcefully as someone else who had never represented
18     your brother?
19              THE DEFENDANT:  Understand.
20              THE COURT:  Okay.  And you don't care about that
21     either?
22              THE DEFENDANT:  No.
23              THE COURT:  And if there's any conflict of any
24     kind that arises as a result of Mr. Katz having previously
25     represented your brother and now representing you, do you
```

1    waive that conflict?

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  So you waive all conflicts whatever

4    they may be known or unknown?

5              THE DEFENDANT:  Yes, ma'am.

6              THE COURT:  All right.  Then I think in light of

7    that, the Court finds that there has been a complete and

8    knowing waiver and that Mr. Katz may continue to represent

9    Mr. Mohammed in this matter.

10             MR. KATZ:  Your Honor, again, thank you for the

11   time you've taken this afternoon.  We appreciate it.

12             THE COURT:  All right.  On to the next.  Okay.

13   Mr. Lichtman.  I appreciate your patience to let me get

14   through these other things.

15             (Following proceedings regarding Defendant Boyd's

16   motion to suppress not requested, not transcribed.)

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE OF REPORTER

2

3     COUNTY OF LOS ANGELES        )

4                                  )   SS.

5     STATE OF CALIFORNIA          )

6

7     I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

8     STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

9     DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

10    FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

11    FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

12    FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

13    FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

14    OF MY STENOGRAPHIC NOTES.

15

16

17    DATE:  _June 14, 2006_

18

19    _____

20    LAURA MILLER ELIAS, CSR 10019

21    FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

UNITED STATES DISTRICT COURT